Victor BROWN, Petitioner

v.

**PA DEPARTMENT OF CORRECTIONS,**
Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 8, 2007.

Decided Aug. 24, 2007.

Victor Brown, petitioner, pro se.

Debra Sue Rand, Asst. Counsel and Suzanne N. Hueston, Chief Counsel, Camp Hill, for respondent.

BEFORE: LEADBETTER, President Judge, FRIEDMAN, Judge, and McCLOSKEY, Senior Judge.

OPINION BY President Judge LEADBETTER.

Victor Brown, an inmate confined at the State Correctional Institution (SCI) at Frackville, filed a *pro se* petition for review in the nature of a complaint in mandamus against the Department of Corrections (DOC), alleging that prison officials are opening his incoming legal mail outside his presence in violation of his constitutional rights. Brown seeks an order directing the DOC to terminate its practice of opening inmates' legal mail outside their presence and to amend its policy to bring it into conformity with the decision of the United States Court of Appeals for the Third Circuit in *Jones v. Brown*, 461 F.3d 353 (3d Cir.2006). He also seeks judgment against DOC for damages for its failure to perform a duty required by law pursuant to 42 Pa.C.S. § 8303.[1] In the context of respondent's motion for summary relief, the question to be determined is whether DOC's legal mail policy impermissibly infringes on inmates' First Amendment rights.

In its answer to Brown's complaint, DOC admits that it opens Brown's legal

---

1. "A person who is adjudged in an action in the nature of mandamus to have failed or refused without lawful justification to perform a duty required by law shall be liable in damages to the person aggrieved by such failure or refusal." 42 Pa.C.S. § 8303.

mail outside his presence with the explanation that mail opened outside Brown's presence has no control number on it. In new matter, DOC avers that pursuant to its policy DC–ADM 803, which governs inmate mail and incoming publications, an attorney or court may correspond confidentially with an inmate by obtaining a "control number" from DOC and placing the number on the envelope. DOC avers that the purpose of the control number is to ensure that contraband does not enter the prison under the guise of privileged correspondence or confidential court mailings. DOC further avers that when mail not bearing a control number is opened outside the inmate's presence, it is inspected but may not be read without the written order of its Regional Deputy Secretary. DOC asserts the affirmative defense of justification in opening Brown's mail outside his presence where the mail does not bear a control number. Brown did not file an answer to the new matter.

■ Before the Court is DOC's motion for summary relief. A motion for summary relief may be granted only where no material fact is in dispute and the right of the moving party to relief is clear. Pa. R.A.P. 1532(b). *Taglienti v. Dep't of Corr.*, 806 A.2d 988 (Pa.Cmwlth.2002).

Pursuant to DOC's policy governing inmate mail, legal mail (i.e., mail from an attorney or a court) delivered to the facility is opened in the prison mail room, outside the presence of the inmate. Mailroom staff inspect the mail for contraband, but do not read it, and reseal it, then it is delivered to the addressee inmate. Legal

mail bearing a control number[2] is opened only in the presence of the inmate.

A control number request from an attorney must include specified information and contain a verification subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities that all mail sent using the control number will "contain only essential, confidential attorney-client communication and shall contain no contraband." DC–ADM 803, Section VI.B.2.b(2)(a). A control number request from a court must be on official letterhead and be signed by a judge or chief non-judicial officer; it need not contain a verification. DC–ADM 803, Section VI.B.2.b(2)(b). The control number is not to be revealed to any inmate, and prison mailroom staff are instructed to cross out the control number with permanent marker before the envelope is sent to the inmate. DC–ADM 803, Section VI.B.2.b(3) and (6).

**Constitutional Violation**

■ Initially we must determine whether petitioner has alleged a constitutional violation. "This analysis involves two steps: determining (1) whether any of [petitioner's] constitutional rights are infringed by the conduct alleged herein; and if so, (2) whether that infringement rises to the level of a constitutional violation, given the specialized standard of review applied to prison regulations and practices." *Bieregu v. Reno*, 59 F.3d 1445, 1450 (3d Cir.1995).

Reviewing the applicable federal case law to determine which constitutional right(s) in particular might be violated by the practice of opening legal mail outside a prisoner's presence,[3] the court in *Bieregu*

---

**2.** The control number is "[a] number obtained through the Department's Office of Chief Counsel authorizing an attorney or court to use the Department's system designed to ensure facility security as well [sic] essential,

confidential attorney-client communications." DC–ADM 803 Section IV.D.

**3.** The *Bieregu* court cited case law from a number of courts of appeals in which it was determined that the practice of opening legal

concluded that "prisoners do not forfeit their First Amendment rights to use of the mails[,]" and that "a pattern and practice of opening properly marked incoming court mail outside an inmate's presence infringes [on] communication protected by the right to free speech." *Id.* at 1452. The court reaffirmed this holding in *Jones v. Brown,* 461 F.3d 353, 359 (3d Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 1822, 167 L.Ed.2d 330 (2007):

> A state pattern and practice, or, as is the case here, explicit policy, of opening legal mail outside the presence of the addressee inmate interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the inmate's right to freedom of speech. The practice deprives the expression of confidentiality and chills the inmates' protected expression, regardless of the state's good-faith protestations that it does not, and will not, read the content of the communications. This is so because "the only way to ensure that mail is not read when opened ... is to require that it be done in the presence of the inmate to whom it is addressed." [*Bieregu*] at 1456 (citing *Wolff v. McDonnell,* 418 U.S. 539, 576–77, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)).

■ While we are not obligated to follow the decisions of the Third Circuit on issues of federal law, *Hall v. Pennsylvania Board of Probation and Parole,* 578 Pa. 245, 851 A.2d 859 (2004), *cert. denied,* 543 U.S. 927, 125 S.Ct. 346, 160 L.Ed.2d 225 (2004), we similarly conclude that the DOC's regulation authorizing the inspection of incoming legal mail outside an in-

mate's presence infringes on constitutionally protected communication.

## Constitutional Violation

■ The fact that the legal mail policy burdens inmates' First Amendment rights does not compel a conclusion that the policy is unconstitutional. When a prison regulation impinges on inmate constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Beard v. Banks,* 548 U.S. ——, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006). The relevant factors in determining the reasonableness of the regulation in question are 1) whether the regulation has a valid, rational connection with the legitimate governmental interest put forward to justify it, 2) whether alternative means of exercising the right remain open to the inmate, 3) the impact that accommodation of the right will have on guards, other inmates, and on allocation of prison resources, and 4) whether there exists an alternative that fully accommodates the inmates' right at a *de minimis* cost to valid penological interests. *Turner,* 482 U.S. at 89–91, 107 S.Ct. 2254.

*Bieregu* involved a pattern of official conduct (contrary to official regulation) rather than a challenge to a prison regulation. A federal prison inmate alleged that on numerous occasions, prison mailroom employees opened and read mail addressed to him from judges. The mail handling policy in question distinguished general mail, that could be opened and inspected, and special mail, that had to be opened in the inmate's presence to be inspected for contraband. To receive the

mail outside a prisoner's presence infringes on the Constitution without identifying a right in particular, and district court decisions within the Third Circuit in which the practice

of opening legal mail outside a prisoner's presence violates the Constitution, but in which the courts have disagreed as to the constitutional rights at issue. *Id.* at 1452.

special handling, special mail, which included legal mail as defined in the present case, had to be marked "Special Mail— Open only in the presence of the inmate" and have a clearly defined sender, except that mail from the chambers of a federal judge was given special handling even without the required markings. The court concluded that the practice failed the *Turner* reasonableness test and violated the Constitution; the court found no reasonable connection had been demonstrated between the opening of legal mail and institutional security on the supposition that correspondence might contain plans for escape or incite violence and concluded that the risk was too insubstantial to justify the infringement on the inmates' First Amendment interests.

In *Jones,* the inmate challenged the New Jersey Department of Corrections' revised legal mail policy[4] pursuant to which all incoming legal mail was opened outside the presence of the inmate and inspected for contraband, resealed, then delivered to the inmate. The stated objective of the revised policy was to inhibit the spread of contamination should a toxic substance be introduced into a correctional institution through incoming legal mail. 461 F.3d at 356. Applying the *Turner* factors, the court reversed the district court and concluded that the revised policy might have been justified as an emergency measure at a time when the risk of an anthrax terrorism attack was sufficiently unquantifiable, but that the State failed to demonstrate an ongoing valid, rational connection between the policy and a legitimate government interest. "[E]ven if an administrator could reasonably conclude [three years after the anthrax emergency] that

there was a non-*de minimis* risk of an anthrax attack on New Jersey prisons, common sense, without more, would not afford a reasonable basis for believing that that risk would be materially reduced by opening letters from lawyers and courts." 461 F.3d at 363.

**Application of the *Turner* Factors**

██ In the present case, we first must determine whether the regulation has a valid, rational connection with the legitimate governmental interest put forward to justify it. The purpose of DOC's policy requiring a control number on legal mail is to ensure that contraband does not enter into the prisons under the guise of legal mail. (Ans. and New Matter, para. 28.) DOC avers that on at least one occasion a court envelope was used to send non-court correspondence to an inmate, and that it would not be difficult for a motivated individual to create a facially valid envelope masquerading as legitimate legal mail. (Ans. and New Matter, para. 30.)

As part of its argument in support of its policy, DOC distinguishes *Jones,* in that 1) the New Jersey policy did not provide a means to protect confidential legal mail, whereas the Pennsylvania policy permits legal mail with a control number to be opened only in the inmate's presence, and 2) New Jersey failed to show that the threat posed by the 2001 anthrax scare presented an ongoing threat. The DOC directs this court's attention to the memorandum opinion in *Robinson v. Pennsylvania Department of Corrections,* No. 03–05180, 2007 WL 210096, 2007 U.S. Dist. Lexis 4930 (E.D.Pa. Jan. 23, 2007), wherein the district court distinguished *Jones* and concluded that the mail policy has a valid, rational connection with the legiti-

---

**4.** The policy was revised in October 2001, pursuant to authority provided in a state-wide declaration of emergency, after letters containing anthrax were processed in a New Jer-sey postal facility which resulted in recipients and postal employees being hospitalized with anthrax poisoning. 461 F.3d at 356.

mate penological interest of preventing the introduction of contraband.[5]

In opposition to DOC's motion, Brown directs this court to a more recent memorandum decision of the same district court, which entered summary judgment in favor of the plaintiff inmates in *Fontroy v. Beard*, 485 F.Supp.2d 592 (E.D.Pa.2007), *injunction pending appeal denied*, 2007 WL 1810690, 2007 U.S. Dist. Lexis 44940 (June 21, 2007). The judge in *Fontroy*, apparently based on much of the same evidence presented in *Robinson*, concluded that Corrections officials failed to provide sufficient factual basis for concluding that legal mail opened in the presence of an inmate presents a risk substantial enough to warrant circumscribing inmates' First Amendment rights.[6] The judge concluded that the undisputed evidence failed to establish a reasonable connection between the legal mail policy and prison security and safety.

The United States Supreme Court most recently applied the *Turner* factors in *Banks*, wherein inmates housed in DOC's long term segregation unit challenged the corrections policy limiting their access to newspapers, magazines, and photographs as violative of their First Amendment rights. The Third Circuit had reversed the district court's grant of summary judgment in favor of the Secretary of Corrections. On appeal, the Supreme Court emphasized that courts owe substantial deference to the professional judgment of prison administrators and that *Turner* reconciled the principles of constitutional protections and necessary restrictions by providing factors relevant in determining the reasonableness of a particular prison regulation. 126 S.Ct. at 2578.

The Supreme Court in *Banks*, in the context of cross-motions for summary judgment and in the absence of any showing by the party bearing the burden of persuasion,[7] took at face value Secretary Beard's stated justifications for the policy and concluded that the Secretary's justification was adequate. In explaining its contrary conclusion the Court explained that the circuit court "placed too high an evidentiary burden upon the Secretary[ ]" and that its statements and conclusions offered "too little deference to the judgment of prison officials about such matters." 126 S.Ct. at 2581.

Given the similar context in this case,[8] we must conclude that DOC's stated rationale for policy of opening legal mail outside the presence of the addressee inmate unless it bears a control number satisfies

---

**5.** In *Robinson,* contraband was identified as including cash, road maps, forged release papers, fraudulent identification materials, and drugs; some of the contraband was identified as having been found in mail classified as legal mail.

**6.** The judge noted that the policy was implemented after a 1999 escape from SCI Huntingdon and was based on pure speculation that the contraband tools used by the escapee were delivered to the institution in legal mail, where it was determined that the local legal mail policy of inspection with a metal detector was not followed. The judge further noted that in the three years between the 1999 escape and the implementation of the mail

policy, there was no evidence of contraband having been introduced into the prison through legal mail.

**7.** Banks filed no opposition to Beard's motion, but rather filed a cross-motion, and in neither the cross-motion nor any other filing did Banks place any significant fact in dispute. 126 S.Ct. at 2580–81.

**8.** *I.e.,* Brown failed to file an answer to new matter in which the DOC alleged justification for its policy and alleged at least one incident of contraband entering a prison in a court envelope containing non-court correspondence, and failed to file in opposition to the DOC's motion for summary relief.

the first *Turner* factor because it sets forth a valid, rational connection with the legitimate penological interest in preventing the introduction of contraband into the prisons under the guise of privileged legal mail.

■ As for the second factor, DOC's policy provides an alternative means for exercise of the right to privileged legal communications by enabling a court or attorney to apply for and use a control number to ensure that privileged communications are opened only in the presence of the inmate. As for the third factor, the impact that accommodation of the right will have on guards, other inmates, and on allocation of prison resources, DOC alleges that if it cannot open mail that does not bear a control number, it cannot effectively screen for contraband. DOC argues that accommodation of an inmates' right to have all legal mail opened in their presence would result in having corrections officers inspecting mail on the spot in the housing unit, rather than having it screened in the mail room by personnel trained to detect contraband, and would increase the likelihood of contraband entering the housing unit undiscovered. Neither Brown nor DOC posits an alternative method that fully accommodates the inmates' rights at a *de minimis* cost to valid penological interests.

Bearing in mind the Supreme Court's instruction that "[t]he real task is not balancing these factors, but rather determining whether [DOC] shows more than simply a logical relation, that is, whether [it] shows a *reasonable* relation[,]" 126 S.Ct. at 2580, we conclude as did the Court in *Banks,* that "prison officials, relying on their professional judgment, reached an experience-based conclusion that the policies help to further legitimate prison objectives." *Id.* Accordingly, DOC's motion for summary relief is granted.

## ORDER

AND NOW, this 24th day of August, 2007, the Department of Corrections' motion for summary relief in the above captioned matter is hereby GRANTED.

## DISSENTING OPINION BY Judge FRIEDMAN.

I respectfully dissent. The majority grants the motion for summary judgment filed by the PA Department of Corrections (DOC), concluding that the DOC's incoming mail policy, which authorizes the DOC to open an inmate's legal mail outside the inmate's presence unless the legal mail contains a control number, is reasonably related to a legitimate penological interest, i.e., preventing the introduction of contraband into the prisons. However, the United States District Court for the Eastern District of Pennsylvania recently reached the opposite conclusion in *Fontroy v. Beard,* 485 F.Supp.2d 592 (E.D.Pa.2007). Although the majority mentions *Fontroy,* the majority does not provide the district court's rationale or offer any explanation for its disagreement with the district court.

As the majority recognizes, in *Jones v. Brown,* 461 F.3d 353 (3d Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 1822, 167 L.Ed.2d 330 (2007), the United States Court of Appeals for the Third Circuit held that a state policy of opening legal mail outside the presence of the addressee inmate impinges upon the inmate's constitutional right to freedom of speech. (Majority op. at 319.) Prior to 2002, the DOC opened all legal and court mail in the presence of the inmate to whom it was addressed. *Fontroy.* Now, the DOC opens legal and court mail in the mail

room to examine it for contraband unless the inmate's attorney or the court has obtained a control number from the DOC's Office of Chief Counsel and has placed the control number on the outside of the envelope. *Id.*; 37 Pa.Code § 93.2(c).

When a prison regulation impinges on the constitutional rights of an inmate, the regulation is valid only if it is reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). In determining the reasonableness of a regulation, the relevant factors are: (1) whether the regulation has a valid, rational connection to a legitimate governmental interest; (2) whether alternative means of exercising the inmate's right remain open to the inmate; (3) the impact that the accommodation of the inmate's right will have on guards, other inmates and the allocation of prison resources; and (4) whether there exists an alternative that fully accommodates the inmate's right at a *de minimis* cost to valid penological interests. *Turner*.

### I. Valid, Rational Connection

In addressing whether the DOC's control number policy has a valid, rational connection with preventing contraband from entering prisons, the district court stated:

> The [DOC's] policy and its purported rationale overlook the obvious. All legal and court mail, with or without a control number, is still opened and inspected by the staff. If there is contraband, it will be discovered. The difference is where [the mail is inspected]—in the mail room if there is no control number, or on the

housing units if there is a control number. In either event, a proper inspection is conducted. The risk of any dangerous contraband, such as escape tools or drugs, eluding the inspection process is minimal compared to the significant infringement of the inmate's constitutional rights resulting from opening the inmate's mail elsewhere.

*Fontroy*, 485 F.Supp.2d at 598. In other words, the control number policy does not prevent contraband from entering prisons; the control number only establishes **where** the staff inspects mail for contraband.

### II. Alternative Means Open to Inmate

Regarding whether **inmates** have an alternative means for exercising their right to privileged legal communications, the district court stated that the only alternative is for inmates to **request** that their attorneys and courts obtain and use control numbers; however, the DOC's policy **does not permit inmates to demand or require such action.**

> If the inmate requests and the attorney fails or refuses to apply for a control number, it is not the attorney who is affected.[1] It is the inmate whose constitutional right is infringed through nothing he has or has not done. This method is not a reasonable alternative to opening the mail in the inmate's presence.
>
> If someone working in an attorney's office or a court was determined to use the guise of legal or court mail to introduce contraband into the prison, the control number procedure would not be an impediment. That person has access

1. Without considering that an attorney might not apply for a control number, the majority states that the control number procedure will "**ensure** that privileged communications are opened only in the presence of the inmate." (Majority op. at 322) (emphasis added). However, because the control number procedure does **not** require that the attorney or court obtain and use a control number when asked, the procedure cannot ensure the inmate's constitutional right.

to the employer's control number and could use it on legitimate legal or court envelopes. Thus, even at the cost of infringing inmates' constitutional rights, the regulation would not accomplish its stated goals of preventing the attempted introduction of contraband into the prisons.

*Fontroy,* 485 F.Supp.2d at 599–600.

### III. Impact of Accommodation

As to the impact that accommodation of an inmate's right will have on guards, other inmates and the allocation of prison resources, the district court stated that the "burden of prison staff hand delivering each piece of legal mail to the inmate and then opening it in his presence is insubstantial." *Fontroy,* 485 F.Supp.2d at 600.

Mail room staff now must check the control number on the envelope against a master list to verify authenticity—a step that is unnecessary when all legal mail is opened in the inmate's presence. . . .

Any cost involved in opening the mail in the inmate's presence is *de minimis* . . . . [I]t takes fifteen seconds to open a piece of mail, fan through the pages, reinsert it in the envelope and reseal the envelope. There is no reallocation of personnel and financial resources required. Correctional officers are opening mail on housing units now. Hence, there is no real impact on other inmates and staff by accommodating the inmates' First Amendment rights.

*Fontroy,* 485 F.Supp.2d at 600 (footnote omitted).

### IV. Alternative Means to Fully Accommodate

Finally, as to whether there exists an alternative means that would fully accommodate the rights of inmates at a *de minimis* cost to valid penological interests, the district court suggests that the DOC need only reinstate its pre–2002 policy by opening an inmate's legal and court mail in the presence of the inmate to whom it is addressed.

Having considered the district court's reasoning in *Fontroy,* and the majority's failure to discuss or refute that reasoning, I would deny the DOC's motion for summary judgment. In my view, the DOC's right to relief is not clear.