George BUSSINGER, GN–0083, SCI–Forest, 1 Woodland Drive, P.O. Box 945, Marienville, Pennsylvania, 16239, Petitioner

v.

The DEPARTMENT OF CORRECTIONS The State Correctional Institution—Forest Jeffrey Beard, Secretary of Corrections Debra K. Sauers, Superintendent of The State Correctional Institution at Forest M.T. Toski, Business Manager D.A. Woodard Erin Wallace–Ireland, Respondents.

Commonwealth Court of Pennsylvania.

Argued May 10, 2011.

Decided Aug. 9, 2011.

Lawrence E. Wood, West Chester, for petitioner.

Debra S. Rand, Mechanicsburg, for respondents.

BEFORE: COHN JUBELIRER, Judge, and BROBSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge BROBSON.

This is a matter in the Court's original jurisdiction. Presently before the Court for consideration are cross-motions for partial summary judgment.[1] Petitioner George Bussinger (Bussinger), an inmate presently located at the State Correctional Facility at Forest (SCI–Forest), challenges a practice and policy of Respondent Department of Corrections (DOC), as implemented by various officials named as additional respondents (collectively, Respondents). The practice and policy involves a DOC form designated "DC–155" and the ramifications for inmates who refuse to execute the form.

DC–155 provides in relevant part as follows:

> I, (print inmate's name and number) _____, do make, constitute, and appoint the Facility Manager/Director, or his/her authorized representative, of any facility or center within the Department of Corrections to which I am then confined my true and lawful attorney for me and in my name to sign my name as endorsement of all checks, money orders, or bank drafts for deposit to my credit in the Inmate General Welfare Cash Account and to receive and document receipt of mail on my behalf.[2]
> *... I understand that if this Power of Attorney is revoked, I will not be able to receive mail, to have any funds deposited to my credit in the Inmate General Welfare Fund Cash Account, and will not be able to spend any funds that have been deposited to my*

---

1. We will treat the cross-motions as cross-applications for summary relief pursuant to Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure. "A motion for summary relief may be granted only where no material fact is in dispute and the right of the moving party to relief is clear." *Brown v. Dep't of Corr.*, 932 A.2d 316, 318 (Pa.Cmwlth. 2007).

2. The provision of DC–155 relating to authorization to receive and document incoming mail on an inmate's behalf is not at issue in this case. Indeed, although there was a point in time where DOC was required to obtain this authority from inmates to handle their incoming mail, as we recognized in *Kutnyak v. Department of Corrections*, 923 A.2d 1248, 1250 n. 1 (Pa.Cmwlth.2007), that authority is no longer required as a result of a change in United States Postal Service (USPS) regulations.

*credit in the Inmate General Welfare Fund Cash Account . . . .*

(Emphasis in original.) As indicated by the first sentence of this form, an inmate who signs DC–155 grants to DOC a power of attorney (POA) (1) to enable DOC to endorse various types of negotiable instruments (hereafter checks) sent to an inmate, and (2) to receive and document mail on behalf of an inmate. Bussinger, however, directs his challenge to the latter part of the form, which provides consequences in the event an inmate revokes the form. In that event, DC–155 provides that the inmate will no longer be permitted to (1) *receive* mail, (2) have any funds deposited into the inmate's account, and (3) spend any funds in the inmate's account.

At some point, likely at the inception of his term of incarceration, Bussinger executed DC–155. On March 31, 2010, Bussinger notified DOC that he wanted to revoke his authorization to DOC to endorse incoming checks on his behalf. Instead, he wished that DOC simply return such mail to the sender. DOC treated this request as a revocation of his DC–155 in its entirety. Pursuant to the terms of the form, DOC consequently prohibited Bussinger from receiving *all* mail—*i.e.*, not just mail including checks. In addition, and notwithstanding the absence of any language to this effect in the form, DOC also prohibited Bussinger from *sending* any mail. In essence, DOC suspended Bussinger's mail privileges in their entirety. It is this practice and policy—*i.e.*, to suspend all mail privileges of an inmate who either refuses to execute DC–155 or attempts to revoke the authority given to DOC in the form (the Challenged Policy) that is the subject of this lawsuit.

DOC has promulgated a regulation that specifically relates to inmate correspondence (Mail Regulation). The Mail Regulation provides: "Inmates are permitted to correspond with friends, family members, attorneys, news media, legitimate business contacts and public officials. There may be no limit to the number of correspondents." 37 Pa.Code § 93.2(a). The Mail Regulation provides further for certain restrictions on inmate correspondence (*e.g.*, relating to safety and security concerns, criminal activity, or obscene materials, etc.) and confers authority on DOC to scrutinize and reject restricted mail. *Id.* § 93.2(b), (e), (f). It includes certain provisions relating to how DOC will handle incoming mail, *id.* § 93.2(c), and outgoing mail, *id.* § 93.2(d). The Mail Regulation includes provisions relating to sealed communications from an inmate's attorney or a court. *Id.* § 93.2(c)(1). Curiously, the Mail Regulation does not at all address or acknowledge in any manner a requirement that inmates execute a POA, and it does not even reference form DC–155.

DOC also has a separate written policy governing inmate mail, DC–ADM 803 (Mail Policy). Though there is some overlap with the Mail Regulation, the Mail Policy contains additional guidelines for the handling of inmate mail. For example, the Mail Policy provides that "[e]ach inmate will be permitted, *without cost*, to mail 10 one-ounce, first-class letters per month," but that "[t]here will be no limit on the number of letters that an inmate may send at his/her own expense." DC–ADM 803 at 1–3 (emphasis added). In addition, the Mail Policy addresses how prison officials will handle incoming mail that includes negotiable instruments:

5. Incoming mail shall be opened and inspected for contraband in the facility's mailroom. Money orders and certified checks shall be recorded, indicating the nature of the receipt, the sender, the amount received, and the date. A **DC–130B, Cash Transaction Receipt** shall be issued

to the inmate for all amounts received. The money order and/or certified check shall be forwarded to the facility Business Manager who shall deposit the money into the inmate's account.

6. The facility **will not accept** personal checks or cash sent through the mail. If a personal check or cash is discovered during an inspection for contraband, the entire piece of mail is to be returned to the sender with a notice that it is being returned because of non-permitted contents.

*Id.* at 3–1 to 3–2 (footnotes omitted) (emphasis in original). Like the Mail Regulation, however, the Mail Policy does not at all address or acknowledge in any manner a requirement that inmates execute a POA with respect to the endorsement of checks and other negotiable instruments, and it does not reference form DC–155.

In his petition for review to the Court and now in his motion for partial summary judgment, Bussinger challenges the constitutionality of DOC's decision to suspend his mail privileges under the Challenged Policy.[3] In his motion, Bussinger seeks an order (1) directing DOC to stop interfering with Bussinger's mail; (2) declaring the

DC–155 form void insofar as it affects Bussinger's right to send and receive mail; and (3) scheduling a hearing on damages and attorneys' fees.[4] In their cross-motion for summary judgment, Respondents seek a judgment in their favor on Bussinger's claim for attorneys' fees, citing the affirmative defense of qualified immunity.

## I. BUSSINGER'S MOTION FOR SUMMARY JUDGMENT

We apply a two-step approach in assessing Bussinger's constitutional challenge. *See Brown,* 932 A.2d at 318. First, we must determine whether the Challenged Policy infringes upon any of Bussinger's constitutional rights. If we answer that question in the affirmative, the second step is to determine whether the policy is nonetheless reasonable—*i.e.,* whether it is "reasonably related to legitimate penological interests." *Brittain v. Beard,* 601 Pa. 409, 974 A.2d 479 (2009) (*Brittain*) (citing *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

In the second step of our analysis, we consider the following factors:

---

3. In his motion, Bussinger also argues that DC–155 amounts to an unpromulgated regulation, in that DOC did not follow the notice and public comment provisions under what is commonly referred to as the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, *as amended,* 45 P.S. §§ 1102–1602, prior to implementing and enforcing the form. *See* 45 P.S. §§ 1201, 1202. Failure to follow the Commonwealth Documents Law can render a regulation invalid and unenforceable. *See Borough of Bedford v. Dep't of Envtl. Prot.,* 972 A.2d 53, 62 (Pa.Cmwlth.2009). A review of Bussinger's petition for review, however, shows that he did not include a cause of action raising the Commonwealth Documents Law. Consequently, we will not consider the issue and related arguments.

4. Bussinger also seeks an order enjoining DOC from deducting sums from his inmate account, other than those payable under "Act 84," unless DOC first conducts a due process hearing. We interpret Bussinger's reference to "Act 84" as a reference to Section 9728 of the Judicial Code, 42 Pa.C.S. § 9728, which relates to the "[c]ollection of restitution, reparation, fees, costs, fines and penalties" imposed upon criminal sentencing from persons convicted of crimes. With regard to this request, we note that Bussinger does not plead any facts in his petition for review relating to "Act 84" and any alleged improper withdrawals from his inmate account. Consequently, for the same reason we refuse to consider Bussinger's Commonwealth Documents Law argument, we also refuse to consider this particular request for relief.

(1) whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interest asserted to justify it; (2) whether alternative means are open to inmates to exercise the asserted right; (3) what impact an accommodation of the asserted constitutional right will have on guards, inmates, and prison resources; and, (4) whether there are "ready alternatives" to the rule that would accommodate prisoners' rights at *de minimus* cost to penological interests.

*Id.* at 421, 974 A.2d at 486. With respect to these factors (known generally as the "*Turner* factors"), the United States Court of Appeals for the Third Circuit has explained:

> These requirements "serve as guides to a single reasonableness standard," but the first [factor] "'looms especially large' because it 'tends to encompass the remaining factors, and some of its criteria are apparently necessary conditions.'"

*Ramirez v. Pugh,* 379 F.3d 122, 126 (3d Cir.2004) (quoting *Waterman v. Farmer,* 183 F.3d 208 (3d Cir.1999)). In assessing these factors, the courts give substantial deference to the professional judgment of prison administrators. *Brittain,* 601 Pa. at 421, 974 A.2d at 486. "[O]nce an inmate commences an action challenging a prison regulation, it is the obligation of [DOC] to set forth, in its answer to the inmate's complaint, its *belief* that there is a valid and rational connection between the challenged regulation and an enumerated legitimate penological interest." *Id.* at 423–24,

974 A.2d at 487 (emphasis added). The burden then shifts to the inmate to prove the *unreasonableness* of DOC's *belief. Id.* at 424, 978 A.2d at 487–88 (emphasis added).

### A. *Turner* Step 1: Are Constitutional Rights Infringed?

■ We begin by considering Bussinger's claim that the Challenged Policy violates the right to access the courts afforded to him under the First Amendment to the United States Constitution. DOC does not dispute that Bussinger's right to access the courts is implicated in this case. "[I]nmates have a 'fundamental constitutional right of access to the courts.'" *Bronson v. Horn,* 830 A.2d 1092, 1095–96 (Pa.Cmwlth.2003) (quoting *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)), *affirmed,* 577 Pa. 653, 848 A.2d 917, *cert. denied,* 543 U.S. 944, 125 S.Ct. 369, 160 L.Ed.2d 257 (2004); *see Brown,* 932 A.2d at 318–19.[5]

■ In addition, though Bussinger focuses on the effect that the Challenged Policy has had on his ability to petition the courts for redress and to communicate with his attorney, we note that the First Amendment to the United States Constitution has long been interpreted by the courts as including a general right to communicate by mail. *See, e.g., Turner,* 482 U.S. at 91–93, 107 S.Ct. 2254 (analyzing constitutionality of regulation restricting inmate-to-inmate mail); *Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (analyzing constitution-

---

**5.** In *Brown,* an inmate challenged a practice by prison officials of opening the inmate's incoming legal mail outside of his presence. We held that this practice "infringes on constitutionally protected communication." *Brown,* 932 A.2d at 319. If the practice of opening incoming legal mail out of an inmate's presence infringes on constitutionally protected communication, *a fortiori,* a practice that effectively prohibits legal communications between an inmate, his counsel, and the courts infringes on constitutionally protected communications. Such is the case with DOC's policy and practice at issue in this action.

ality of regulation restricting prisoner receipt of outside publications by mail).

## B. *Turner* Step 2: Reasonableness

In light of the foregoing, we must now assess the reasonableness of the Challenged Policy by applying the *Turner* factors. The first factor requires us to determine whether the Challenge Policy "has a valid, *rational connection* with the legitimate governmental *interest* put forward to justify it." *Brown*, 932 A.2d at 319 (emphasis added).

With respect to the first *Turner* factor, Respondents argue:

> Applying prong one of *Turner*, the undisputed evidence shows that the penological reason for tying the POA to both mail and the inmate's account is to allow [DOC], when it receives a check payable to an inmate in the mail, to endorse and deposit that check. In addition, the opposing Affidavit of Michael Knaub sets forth other bases for the POA form.

(Corrections' Br. at 12.) In his affidavit, Michael Knaub (Knaub),[6] offers the following with respect to DC–155 and the included POA:

5. One purpose of . . . DC–155 . . . is to allow the institutions to receive and endorse negotiable instruments that arrive by mail so that funds can be placed in inmates' prison accounts.

6. If there were no DC–155, the only way the institution could negotiate instruments received in the mail is to take them to the various inmates and have them endorse them.

7. This process would create needless risks by requiring that a prison official bring each check for each pris-

oner to obtain the needed endorsement.

8. If each of the approximately 50,000 inmates in the state correctional system were permitted to modify the DC–155, mailroom staff would necessarily have to review the form for each inmate to determine what actions, if any, they were permitted to take with respect to each piece of mail.

9. This would make prompt delivery of the mail impossible.

10. Further, given the state's nearly 50,000 inmates, this would be a time-consuming and burdensome administrative process.

11. Another purpose of the POA form is to authorize the Department to manage, in general, the inmate's account.

12. Integral to that management function is the withdrawal of funds to pay for inmate postage because inmates are not permitted to possess postage stamps in order to prevent them from using the stamps for bribery, gambling, extortion or other nefarious activities.

13. Also integral to that function is the withdrawal (sic) funds to pay for inmate commissary, cable television, outside purchases and court-oriented costs, restitution, and fines.

14. The POA also serves as a "safety net" document, if some other more specific authorization form (such as one for commissary) is inadvertently not obtained or is lost.

15. The POA gives DOC the authority to handle the day to day operations

---

**6.** The affidavit is an attachment to Respondents' answer to Bussinger's motion for partial summary judgment.

and activities that affect inmate accounts, not just negotiable documents.

We note, again, that Respondents' burden here is not high. Respondents need only set forth their *"belief* that there is a *valid and rational connection* between the challenged regulation and an *enumerated legitimate penological interest." Brittain,* 601 Pa. at 423–24, 974 A.2d at 487 (emphasis added). There is no doubt, in considering Respondents' response to Bussinger's motion, including the Knaub affidavit, that DC–155 allows DOC to do certain things that it may not be able to do without the POA. In other words, we can accept that DOC implemented DC–155 and enforces its terms for a reason, or many reasons, and with a goal, or goals, in mind.

█ The question under the first prong of *Turner,* however, is not whether DOC has a purpose behind the Challenged Policy, or even whether the Challenged Policy is effective. Instead, the question is whether the Challenged Policy has a valid and rational connection to a "legitimate *penological* interest." It is this connection to an interest unique to our prison system that justifies the substantial deference we afford DOC in these types of cases:

> We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them.

*Overton v. Bazzetta,* 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003).

In *Overton,* for example, an inmate challenged certain restrictions on visits with prison inmates. The State of Michigan adopted regulations to address concerns about an increase in the number of prison visitors. One of the measures was to define the types of visitors an inmate may receive, thereby limiting the overall number of visitors to the prison. The United States Supreme Court upheld the restriction on visitation by children, because

> the regulations bear a rational relation to MDOC's [7] valid interests in *maintaining internal security* and *protecting child visitors* from exposure to sexual or other misconduct or from accidental injury. The regulations *promote internal security,* perhaps the most legitimate of penological goals, ... by reducing the total number of visitors and by limiting the disruption caused by children in particular. *Protecting children from harm* is also a legitimate goal. . . . The logical connection between this interest and the regulation is demonstrated by trial testimony that reducing the number of children allows guards to supervise them better to ensure their safety and to minimize the disruptions they cause within visiting areas.

*Id.* at 133, 123 S.Ct. 2162 (emphasis added). The Supreme Court also upheld the restriction on visitations by former inmates:

> MDOC's regulation prohibiting visitation by former inmates bears a self-evident connection to the State's interest in *maintaining prison security* and *preventing future crimes.* We have recognized that "communication with other felons is a potential spur to criminal behavior."

*Id.* at 133–34, 123 S.Ct. 2162 (quoting *Turner,* 482 U.S. at 91–92, 107 S.Ct. 2254) (emphasis added). The Supreme Court also upheld a "restriction on visitations for inmates with two substance-abuse violations," because the restriction "serves the legitimate goal of *deterring the use of*

---

7. Michigan Department of Corrections.

*drugs and alcohol within prisons.* Drug smuggling and drug use in prison are intractable problems." *Id.* at 134, 123 S.Ct. 2162 (emphasis added).

In *Brittain,* our Pennsylvania Supreme Court applied the *Turner* factors in upholding a DOC administrative directive, which precluded inmates from possessing pornography. With respect to the first *Turner* factor, the court opined:

> Here, . . . [DOC] set forth . . . its belief that there is a "valid, rational connection" between the anti-pornography policy and a legitimate governmental interest because the pornography ban serves *to foster the rehabilitation of inmates,* including sex offenders . . ., and is *consistent with inmate treatment objectives,* particularly discouraging inmates from "objectifying" others, rather than treating them as individuals. [DOC] further notes that [the policy] prevents inmates from possessing materials that foster inappropriate sexual desires, which are often the precursor to sexually offending behavior.

*Brittain,* 601 Pa. at 424, 974 A.2d at 488 (emphasis added).

In *Brown,* this Court granted DOC's motion for summary relief. In applying the first *Turner* factor, this Court held that a policy that allowed prison officials to open up an inmate's legal mail outside the presence of the addressee inmate bore a reasonable relation to the legitimate penological interest in ensuring that "contraband does not enter into the prisons under the guise of legal mail." *Brown,* 932 A.2d at 320–22.

Under these and similar cases, then, courts have recognized legitimate penological interests in (a) maintaining internal security for the protection of prison employers, prisoners, and visitors; (b) deterring the use of drugs and alcohol in prisons; (c) preventing future crime; (d) the rehabilitation of inmates; (e) fair and appropriate treatment among inmates; (f) curbing sexually-offensive behavior in the prison; and (g) controlling/eliminating the flow of contraband into prisons.[8] With this background in mind, we now turn to Respondents' asserted "interests" in this case.

Respondents claim in their brief that the first prong of *Turner* is satisfied because the POA "allow[s] [DOC], when it receives a check payable to an inmate in the mail, to endorse and deposit that check." Paragraph five (5) of the affidavit of the Knaub includes this same assertion. This claim, however, merely restates the contents of DC–155 and the POA:

> I, (print inmate's name and number) ———————————, do make, constitute, and appoint the Facility Manager/Director, or his/her authorized representative, of any facility or center within the Department of Corrections to which I am then confined my true and lawful attorney for me and in my name *to sign my name as endorsement of all checks, money orders, or bank drafts for deposit to my credit in the Inmate General Welfare Cash Account . . . .*

(Emphasis added.) Respondents simply do not identify any penological interest to support the Challenged Policy, which cuts off an inmate's ability to send and receive mail—particularly mail between the inmate and his counsel and the courts—where the inmate refuses to execute the POA. Accordingly, Respondents have failed to set forth in their brief opposing Bussinger's motion for summary judgment

---

**8.** *See also Pell v. Procunier,* 417 U.S. 817, 822–23, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (recognizing deterrence of crime, rehabilitation and internal security within corrections facilities as "legitimate penal objectives").

and in paragraph 5 of the Knaub affidavit any legitimate penological interests that they believe has a valid and rational connection to the Challenged Policy.

■ Paragraphs 11 through 15 of the Knaub affidavit provide that the POA grants DOC authority to "manage" an inmate account by ensuring that funds are available in the inmate account to pay for inmate purchases, including, *inter alia,* postage, and any assessed court-ordered costs, restitution, and fines. We cannot accept these allegations as statements of legitimate penological interests. Certainly inmates may have an interest in ensuring that they have enough money in their accounts to pay for postage,[9] cable television, and other purchases at the commissary. But Respondents fail to explain how DOC has any penological interest in ensuring that inmates fund their inmate accounts for these purposes. We also reject Knaub's claim that the POA grants authority to DOC to manage the inmate's account. This assertion is simply not supported by the language in DC–155. The only thing DC–155 authorizes DOC to do in terms of the inmate account is to deposit checks in the inmate account on the inmate's behalf. It does not authorize DOC to "manage" the account or even to withdraw funds from the account.[10]

■ We likewise reject the suggestion that DOC has some penological interest in ensuring that funds are available in inmate accounts to pay for an inmate's court-ordered costs. Although DOC is authorized by law to make monetary deductions from an inmate's account "for the purpose of collecting restitution or any other court-

ordered obligation or costs,"[11] this authority is in furtherance of the sentencing county's interest in collecting such charges from the inmate. Indeed, DOC is required to remit any amounts so collected to the county in which the inmate was convicted. DOC is not required by law to ensure that inmate accounts are funded for this purpose. It does not retain for its own benefit the deducted funds. Accordingly, we are not convinced that DOC has any legitimate penological interest in ensuring that funds are available in inmate accounts to satisfy a trial court's order to pay costs, fines, restitution, etc.

Paragraphs six (6) through ten (10) of the Knaub affidavit set forth Knaub's view of how an institution would have to proceed if DC–155 did not exist. In these paragraphs, Knaub claims that in the absence of the POA, prison officials would have to deliver checks to prisoners for endorsement, placing the prison officials' safety and security at risk. In terms of allowing some inmates to opt out of or, as Knaub states, "modify" DC–155, Knaub claims that having all prisoners execute a single form provides greater administrative efficiencies in the handling and distributing of incoming inmate mail.

■ Certainly, DOC has legitimate penological interests in providing for the safety and security of their employees and in the administration and management of inmate mail. Under the first prong of *Turner,* we must evaluate whether the Challenged Policy "has a valid, *rational connection*" to these legitimate penological interests. The Challenged Policy cuts

9. As noted above, DOC's mail regulations provide inmates with ten outgoing letters per month, without charge. DC–ADM 803 at 1–3 (emphasis added).

10. Other DOC policies relating to inmate accounts may provide DOC with the authority to

deduct funds from an inmate account. Our point here is only that Knaub's claim that the POA provides that authority is a mischaracterization the contents of DC–155.

11. Section 9728(b)(5) of the Judicial Code, 42 Pa.C.S. § 9728(b)(5).

off an inmate's mail privileges, as set forth in the Mail Regulation and the Mail Policy, where the inmate refuses to execute the POA in DC–155, giving DOC authority to endorse checks on an inmate's behalf and deposit the same in the inmate's account. Though we would have appreciated a clearer articulation, Bussinger appears to contend that the Challenged Policy both lacks any legitimate penological underpinnings and does not at all advance any legitimate penological interest in light of the many other controls in the system for handling incoming inmate mail. (Bussinger Br. at 16–18.) In *Turner*, the Supreme Court noted:

> [A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one.

*Turner*, 482 U.S. at 89–90, 107 S.Ct. 2254.

Under the first *Turner* factor, it is reasonable for DOC to establish a system to handle incoming inmate mail that includes checks payable to the inmate. Indeed, as noted previously, the Mail Policy provides for the treatment of incoming mail that includes negotiable instruments: (1) money orders and certified checks are recorded and forwarded to the facility business manager for deposit in the appropriate inmate account; and (2) personal checks are not accepted and will be returned to the sender. DC–ADM 803 at 3–2 (emphasis added). These procedures are not at issue in this case. At issue here is a practice and policy separate and apart from DOC's comprehensive Mail Regulation and Mail Policy. It is a practice and policy that prohibits an inmate from receiving *and sending* any mail, not just mail including negotiable instruments, if the inmate refuses to grant DOC power of attor-

ney to endorse checks (presumably money orders and certified checks, as DOC policy provides that personal checks will not be accepted) and deposit the funds in the inmate's account. This Challenged Policy makes the execution of the POA compulsory, because the alternative to the inmate is punitive.

Knaub claims in his affidavit that the Challenged Policy is necessary, as the only alternative would require prison officials to seek out inmates to endorse checks at the risk of personal safety. We are not convinced. Knaub appears to assume, without any support, that DOC is obligated to obtain inmate signatures on checks and to deposit the same in the inmate's account. But neither Knaub nor Respondents cite to authority imposing such an obligation on DOC. Accordingly, DOC's concern that staff safety would be adversely impacted in the absence of DC–155 appears to be speculative, at best. In our estimation, such a speculative concern falls far short of showing a rational connection to DOC's legitimate penological interest in ensuring staff safety.

We have noted above the existence of DOC's comprehensive Mail Regulation and Mail Policy. With such an all-encompassing scheme, the Court is hard-pressed to find any gap in DOC's authority over inmate mail that is necessarily filled by the POA. We thus do not see how the existence of DC–155 enhances DOC's ability to manage inmate mail. In paragraphs 8 through 10 of his affidavit, Knaub expresses concerns over the possible ramifications if this Court were to allow inmates to "modify the DC–155." The issue in this case, however, is not whether inmates can or should be allowed to choose which portions of DC–155 they will agree to and which ones they reject. Indeed, the only part of DC–155 that has any lingering value to DOC relates to the POA with

respect to endorsement and deposit of checks.[12] Accordingly, Knaub's concerns over multiple forms of DC–155 and the need to verify each time an inmate receives mail which form the inmate has executed appear to be unfounded.

For these reasons, we concluded that the Challenged Policy, which compels inmates to execute DC–155 under threat of losing all mail privileges, bears no logical or rational connection to DOC's concerns over staff safety and the efficient handling of inmate mail. Alternatively, if there is a connection, it is so remote that it renders DOC's practice and policy arbitrary and capricious. Application of the first *Turner* factor, therefore, suggests that the Challenged Policy is unreasonable.

As for the second factor, Respondents argue:

> [A]n inmate can exercise his right to control his finances by establishing his account outside the prison and directing payees to send his money there.... Thus, when he signs the POA form, he will not be impacting his ability to control his finances, but will be allowing for sending and receipt of all of his mail.

(Respondents' Br. at 12.) What Respondents are suggesting is that Bussinger acquiesce to the Challenged Policy while at the same time attempt to frustrate what Respondents' maintain are the underlying purposes and goals of the Challenged Policy. This is a curious argument, and one we do not find appealing where, in this case, it is our charge to assess, using the *Turner* factors as guides, the *overall* reasonableness of the Challenged Policy. *Ramirez*, 379 F.3d at 126.

We do not interpret the second factor of *Turner* as requiring us to consider whether there are any ways for an inmate to avoid a practice and policy that infringes on a constitutional right. Instead, we believe the inquiry is whether the challenged practice and policy itself leaves open alternative means for the exercise of the right. In *Brown*, for example, we found that the policy at issue satisfied the second *Turner* factor because it "provide[d] an alternative means for exercise of the right to privileged legal communications by enabling a court or attorney to apply for and use a control number to ensure that privileged communications are opened only in the presence of the inmate." *Brown*, 932 A.2d at 322. Here, the Challenged Policy is quite clear and inflexible—*i.e.*, sign the POA or lose *all* mail privileges. It leaves no room for an inmate to maintain his First Amendment rights to correspond by mail if he elects not to sign the POA. We believe that, under these circumstances, application of the second *Turner* factor suggests that the Challenged Policy is unreasonable.

As for the third factor, the impact that accommodation of the right will have on guards, inmates, and prison resources, Respondents argue:

> [P]ermitting an inmate to execute only a partial POA will cause administrative problems processing mail and checks ... and will hamper prison resources by facilitating self-induced bankruptcy of prison accounts, causing [DOC] (and, ultimately, the taxpayers) to have to pay for services that an inmate with money in his prison account would otherwise be expected to cover, such as the cost to transfer ... excess personal property alluded to here, medical co-payments, and restitution for medical injuries to other inmates. Further, as Mr. Gimble[, the institutional business manager at the state correctional institution at Camp Hill] testified, without a POA, [DOC] also cannot withdraw funds to

12. *See infra* n. 2.

remit an inmate's costs, fines and restitution to the sentencing court.

(Respondent's' Memorandum of Law in Opposition to Petitioner's Motion for Partial Summary Judgment at 12–13.) These arguments, however, do not address how an *accommodation of the right* in question—*i.e.*, the constitutional right to legal correspondence (or all mail correspondence)—will impact guards, inmates, and prison resources. Respondents' arguments, instead, focus on the value they ascribe to the POA.[13] Respondents' arguments, therefore, miss the mark.

We know, however, that DOC's Mail Regulation provides extensive procedures for handling incoming correspondence, generally, and legal correspondence, specifically. *See* 37 Pa.Code § 93.2. Similarly, DOC's Mail Policy provides procedures for handling incoming and outgoing mail, including privileged mail correspondence between an inmate, his attorney, and/or the courts. We also know that DOC reviews all incoming and outgoing mail and verifies whether the inmate has the authority to send or receive the particular type of mail.[14] We know from the Mail Policy that all incoming mail is inspected for contraband. We also know from the Mail Policy that if any incoming mail includes cash or a personal check, it will be returned to the sender.

DOC, therefore, already bears a heavy administrative burden in handling incoming and outgoing mail, including privileged legal mail. These burdens include inspecting all mail to determine whether it should be accepted or returned. It includes returning to the sender cash and personal checks sent to an inmate by mail. Indeed, it also includes returning to the sender, at the inmate's expense, or otherwise disposing of incoming mail that is "undeliverable for any reason other than those stated in **Section 1.A.3.** [not at issue here]." DC–ADM 803 at 3–2 (emphasis in original).

In light of the process and procedures DOC already employs in handling inmate mail, we see no added burden by requiring DOC to apply its own Mail Regulation and Mail Policy to inmate mail, regardless of whether a particular inmate signed DC–155, refused to sign DC–155, or signed but later revoked DC–155. We see as nominal any additional burden that DOC might be required to endure if, in processing incoming inmate mail that includes a check (other than personal check), it must verify whether an inmate has executed a POA to determine whether it can endorse the check and deposit the same in the inmate's account. Accordingly, we find that consideration of the third *Turner* factor suggests that the Challenged Policy in this case is unreasonable.

 Finally, in considering the fourth *Turner* factor, we note the following guidance from the Supreme Court:

**13.** For the reasons set forth above, Respondents' concerns about what a "partial" POA would mean are unfounded. We also ascribe no legal significance, for purposes of our analysis in this case, to Respondents' concern about the burdens placed on the prison system and, by extension, the taxpayers of the Commonwealth of Pennsylvania if prisoners find ways to avoid funding their inmate accounts. Although these may be legitimate concerns, they are best addressed by the General Assembly. As it stands, this Court is unaware, and Respondents do not cite to, any law or regulation that requires inmates to maintain a minimum fund balance in their inmate accounts.

**14.** Notes of Testimony, July 14, 2010 (Preliminary Injunction Hr'g) at 27 (testimony of Robert Gimble):

Q So for every piece of mail that goes out, there's some verification that is done to determine whether there is authority to accept or send that person's mail?
A. Yes.

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Turner*, 482 U.S. at 90, 107 S.Ct. 2254. Here, we believe Bussinger has put forth an obvious and easy alternative to the Challenged Policy at *de minimis* cost, if any, to DOC's penological concerns about prison staff safety and efficient mail administration. That alternative is to return to the sender *all* negotiable instruments, not just personal checks as DOC's Mail Policy currently provides, if an inmate is unwilling to give DOC power of attorney to negotiate and deposit those funds in the inmate's account. This alternative does not require DOC staff to seek out inmates to obtain their signatures on checks, at risk of personal safety, and it would only require DOC to extend to all negotiable instruments the policy it already has in place for personal checks. Accordingly, we find that consideration of the fourth *Turner* factor suggests that the Challenged Policy in this case is unreasonable.

■ Based on the foregoing, we conclude that the Challenged Policy unreasonably infringes on Bussinger's First Amendment rights. Respondents, however, urge us to conclude otherwise, citing

*Guyer v. Beard*, 907 F.2d 1424 (3d Cir. 1990) (*Guyer II* ). In *Guyer II*, an inmate commenced an action challenging a correctional facility's return of his incoming mail to sender due to the inmate's refusal to execute a POA, authorizing prison officials to receive inmate email. The POA at issue in *Guyer II* appears to be similar, but not identical, to the POA set forth in DC–155, in that it provides authority to prison officials (a) to receive and document mail on an inmate's behalf and (b) to sign as endorsement all negotiable instruments for deposit in an inmate's account. As noted above, however, the inmate's suit in *Guyer II* challenged only the portion of the POA dealing with authorization to handle inmate mail. In that regard, then, it is distinguishable from this case, where Bussinger challenges the portion of the POA relating to the endorsement of incoming checks.

In addition, the Third Circuit's decision in *Guyer II* did not resolve the inmate's substantive legal challenge to the POA. Instead, the Third Circuit reviewed the trial court's dismissal of the substantive challenge because the inmate failed to comply with the trial court's pretrial order:

[O]ur decision does not address the merits of Guyer's habeas claims or determine whether those claims have been exhausted. Instead, our decision addresses the reasonableness of the district court's pretrial order and later dismissal of the habeas petition for Guyer's failure to obey the pretrial order.

*Guyer II*, 907 F.2d at 1427–28. It just so happened that the trial court's pretrial order required the inmate to grant prison officials a limited POA to receive and document receipt of correspondence to the inmate related to his case pending in the district court. The trial court concluded that the district court acted reasonably for three related reasons: (1) to further the

parties' communications with the Court; (2) to comply with a then-existing USPS regulation, "which require[s] prison officials to obtain inmates' consent to the prison's receipt of their mail so that prison officials can open, inspect, and censor incoming mail"; and (3) to further the legitimate penological interest of the prison in ensuring that contraband is not delivered to inmates through the mail. *Id.* at 1428–29. The Third Circuit thus affirmed the trial court's order, dismissing the inmate's claim for failure to comply with the district court's reasonable pretrial order.

We cannot extract from the Third Circuit's decision in *Guyer II* any guidance on the question of the constitutionality of the Challenged Policy. The Third Circuit opinion does not at all address the portion of the POA at issue in this case—*i.e.*, the portion relating to the endorsement of checks and deposit of funds in the inmate's account. It also does not address the Challenged Policy *in toto*—*i.e.*, the policy and practice of revoking an inmate's mail privileges in their entirety if the inmate refuses to grant this particular authority

to DOC. Finally, we note that the Third Circuit in *Guyer II* relied heavily, if not entirely, on a USPS regulation that is no longer in effect. *See Kutnyak*, 923 A.2d at 1250 n. 1. We, therefore, do not find the Third Circuit's decision in *Guyer II* persuasive or helpful in our analysis of the question now before this court.[15]

We also reject Respondents' contention in their brief in opposition that we should disregard the constitutional infirmities of the Challenged Policy because Bussinger would not be harmed if he simply executed DC–155. Respondents cite to no legal authority for this interesting take on the "unclean hands" doctrine,[16] and we refuse to apply it here.

Accordingly, we will grant Bussinger's motion for partial summary judgment with regard to his constitutional challenge to the Challenged Policy. For the reasons set forth above, the Challenged Policy unreasonably interferes with rights afforded to Bussinger under the First Amendment to the United States Constitution.[17]

15. Respondents also direct us to two unreported decisions from the United States District Court for the Eastern District of Pennsylvania. The district court decisions are *Guyer v. Zimmerman*, 1986 WL 13638, Civ. A. No. 86–6023 (E.D.Pa. Nov. 26, 1986) (*Guyer I*), and *Toth v. Zimmerman*, 1986 WL 3856, Civ. A. No. 85–3803 (E.D.Pa. Mar. 31, 1986). We note that the district court issued both of these decisions before the United States Supreme Court issued its opinion in *Turner*. Thus, the district court in *Toth*, on which the district court relied in *Guyer I*, did not apply the *Turner* factors, which we must apply in this case. We also note that although the district court in *Toth* found that both portions of the POA—for mail and for endorsement and deposit of checks—were reasonable, it did so in the shadow of the same, now-defunct USPS regulation that the Third Circuit relied on in *Guyer II*. Finally, the prison officials in *Toth* apparently only refused to allow the inmate to receive mail if the inmate refused to execute the POA. Here, by contrast, the practice and policy in question is to revoke *all* mail privileges if an inmate refuses to execute the POA. Because of these substantial differences, both factual and legal, we do not find these unreported district court decisions persuasive.

16. Under the doctrine, "[a] court may deprive a party of equitable relief where, to the detriment of the other party, the party applying for such relief is guilty of bad conduct relating to the matter at issue. The doctrine ... requires that one seeking equity act fairly and without fraud or deceit as to the controversy in issue." *Terraciano v. Dep't of Transp., Bureau of Driver Licensing*, 562 Pa. 60, 69, 753 A.2d 233, 237–38 (2000) (citations omitted).

17. The Challenged Policy at issue is a DOC practice and policy. We will, consequently, enter summary judgment against DOC only (and not SCI–Forest and the individual named respondents) on this claim.

## II. REQUEST FOR HEAR-ING/CROSS–MOTION FOR SUMMARY JUDGMENT

In his motion for partial summary judgment, Bussinger also requests a hearing on his claim for damages and attorneys' fees. With respect to his attorneys' fees claim, Bussinger seeks attorneys' fees under Section 2503(9) of the Judicial Code, 42 Pa.C.S. § 2503(9),[18] and 42 U.S.C. § 1988(b).[19] In its cross-motion for partial summary judgment, Respondents assert the affirmative defense of qualified immunity to Bussinger's request for attorneys' fees.

We note that although this Court has concluded above that the Challenged Policy does not pass the constitutional test, Bussinger's petition for review also includes claims of conspiracy, retaliation, and a violation of DOC's Mail Regulation. There is no motion for summary judgment pending before the Court with respect to those particular claims. Thus, given the limited and focused merits issue before the Court and the possibility that other merits issues remain unresolved, we will deny Bussinger's request for a hearing on damages and counsel fees.

We will also deny, without prejudice, Respondents' cross-motion for summary judgment. Instead, we will schedule a status conference with the parties to determine what, if any, merit claims remain for this Court's disposition. After all merit claims have been resolved, the Court will entertain Bussinger's request for damages and attorneys' fees, at which point Respon-dents will be permitted to assert their defenses to the request.

### ORDER

AND NOW, this 9th day of August, 2011, the motion of Petitioner George Bussinger for partial summary judgment is GRANTED in part. Summary judgment is entered in favor of Petitioner and against Respondent Department of Corrections (DOC) on Petitioner's constitutional challenge as follows:

1. DOC's policy and practice, as reflected in DC–155 and as applied to Petitioner, to revoke all mail privileges where an inmate refuses to grant DOC authority to endorse checks and deposit the same in his inmate account, unreasonably interferes with rights afforded to Petitioner under the First Amendment to the United States Constitution.

2. DOC is permanently enjoined from enforcing this policy and practice against Petitioner.

3. Petitioner is not entitled to greater mailing privileges than what is provided for in the DOC mail regulation, 37 Pa. Code § 97.2, and the agency's policy on inmate mail (DC–ADM 803). DOC may thus continue to enforce its mail regulation and its policy statement as to Petitioner's incoming and outgoing mail.

4. Nothing in this order prevents DOC from taking reasonable steps in handling any incoming mail that includes negotiable instruments in light of Petitioner's refusal to grant DOC power of attorney to endorse and deposit the pro-

---

18. "The following participants shall be entitled to a reasonable counsel fee as part of the taxable costs of the matter: ... (9) Any participant who is awarded counsel fees because the conduct of another party in commencing the matter or otherwise was arbitrary, vexatious, or in bad faith." Section 2503(9) of the Judicial Code.

19. "In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title ..., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs...." 42 U.S.C. § 1988(b).

ceeds of those instruments in his inmate account.

5. The preliminary injunction entered by the Court on August 24, 2010 is hereby DISSOLVED.

It is further ORDERED that Petitioner's request for a hearing on his request for damages and attorneys' fees is DENIED.

It is further ORDERED that Respondents' cross-motion for summary judgment is DENIED without prejudice.