**Lucille MORELAND, Demarrion Quintrell Jett and Dominisha Lanae Jett, two minor children, by and through Annette Lavon Jett, as their natural mother and general guardian, Plaintiffs–Appellants,**

v.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT; Officer James G. Burns; Officer Jack W. Pope, Defendants–Appellees.**

No. 97–17070.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 9, 1998.

Decided Sept. 24, 1998.

As Amended Nov. 24, 1998.

---

Robert J. Kossack, Kossack Law Offices, Las Vegas, NV, for plaintiffs–appellants.

Brian C. Whitaker and Peter M. Angulo, Rawlings, Olson, Cannon, Gormley & Desruisseaux, Las Vegas, NV, for defendants–appellees.

Before: HALL and THOMAS, Circuit Judges, and WHALEY,\* District Judge.

WHALEY, District Judge.

Lucille Moreland, Demarrion Quintrell Jett, and Dominisha Lanae Jett appeal from the district court's grant of summary judgment in Appellees' favor on Appellants' 42 U.S.C. § 1983 and related state law claims arising from the shooting death of Damon Douglas. Appellants' central theory of this case is that Appellee Burns inadvertently shot the wrong man during a gunfight outside a Las Vegas bar and then he and his partner lied to cover up this mistake. Having considered this and Appellants' other arguments in full, we affirm.

## I.

This case stems from a gunfight that took place outside of a Las Vegas bar shortly after midnight on September 18, 1993. It is undisputed that when the smoke from this fight cleared, Damon Douglas ("Douglas") lay fatally wounded by a bullet fired by Appellee James Burns ("Burns"). Appellants are Douglas's mother and his two minor children. Appellees are the Las Vegas Metropolitan Police Department ("Metro") and two of its police officers, Burns and Jack Pope ("Pope").

Shortly after midnight on the night of September 17–18, 1993, Burns and Pope responded to a dispatch call indicating there was a fight in the parking lot of the Chances Arr bar in northwest Las Vegas. As Burns and Pope approached in their vehicle, they spotted a male standing beside a car in the parking lot, firing a semiautomatic handgun at individuals who were returning fire from the eastern side of the lot. Burns and Pope stopped their vehicle, illuminated the male

with lights, and took cover behind a wall in a position approximately 45 feet behind and slightly to the right of the male. From this vantage point, Burns and Pope could see there were between 50 and 100 people trapped in the parking lot, many of whom were caught in the ongoing crossfire.

When the male failed to comply with the officers' orders to stop firing, Burns and Pope both fired at him. As each officer fired his final shot, the male fell to the ground and crawled away from the officers, toward the bar. After the shooting stopped, Burns and Pope looked for the male and found Douglas lying on the ground near the front of the bar. Douglas was taken to a local hospital and died shortly thereafter. An autopsy and forensics investigation determined that Douglas had been shot once by a bullet fired from Burns's gun that severed a major artery in Douglas's hip. No gun was found in Douglas's possession, but a semiautomatic pistol was found on the ground in front of the vehicle from which the male had been firing. Metro's fingerprint examiner excluded Douglas as the source of one of the two prints found on the gun, but could neither exclude nor identify Douglas as the source of the second print.

Burns and Pope gave statements to Metro investigators at the scene and later testified at the coroner's inquest that was held regarding the shooting of Douglas. In their inquest testimony and interviews at the scene, Burns and Pope identified Douglas as the man at whom they shot. Pope also testified that only the male's right side was exposed when he and Burns shot, while Burns stated that the male also exposed his left side to Burns as Burns fired his final shots. Additional inquest testimony and witness affidavits presented to the district court suggest Douglas may have been elsewhere in the parking lot for at least some part of the gunfight.[1]

---

\* The Honorable Robert H. Whaley, United States District Judge for the Eastern District of Washington, sitting by designation.

1. In support of this theory, Appellants principally point to: 1) the discrepancy between the fact that Douglas was shot in his left hip and Pope's inquest testimony that the officers shot at the

male's right side and the officers' description of their position as being to the rear and right of the man at whom they shot; 2) Metro's inability to identify Douglas as the source of any of the fingerprints on the gun; and 3) witness statements that suggest Douglas may have been elsewhere in the parking lot during portions of the

Appellants subsequently filed this lawsuit, asserting three causes of action against Appellees. The first cause of action was brought pursuant to 42 U.S.C. § 1983, based on four distinct theories of relief. The complaint also asserted state law wrongful death and intentional infliction of emotional distress causes of action. The district court ultimately granted Appellees' motions for summary judgment on all of Appellants' claims, and Appellants timely appealed.

## II.

■■■ We review de novo district court decisions regarding standing, summary judgment, and the proper interpretation of state law. *Byrd v. Guess,* 137 F.3d 1126, 1131 (9th Cir.1998); *Jesinger v. Nevada Fed. Credit Union,* 24 F.3d 1127, 1130–31 (9th Cir.1994); *In re McLinn,* 739 F.2d 1395, 1397 (9th Cir.1984) (en banc). Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment under the legal principles that govern the case at issue. *Jesinger,* 24 F.3d at 1130. A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Issues of fact do not preclude summary judgment unless they are material to the substantive claim at issue; that is, unless they "might affect the outcome of the suit under the governing law." *Id.* We may affirm the district court's judgment on any ground finding support in the record, even if it relied on the wrong ground or reasoning. *Polich v. Burlington Northern, Inc.,* 942 F.2d 1467, 1469–70 (9th Cir.1991).

## III.

Appellants' § 1983 theories of relief fall into two general categories: Fourth and Fourteenth Amendment theories arising directly from Burns's fatal shooting of Douglas, and two Fourteenth Amendment theories arising from Burns's and Pope's testimony at the coroner's inquest. The district court ruled that Appellants lacked "standing" to seek relief under § 1983 with respect to each of these theories, with the exception of the Fourteenth Amendment claim relating directly to Douglas's shooting. Because the question of whether a particular party has standing to pursue a claim naturally precedes the question of whether that party has successfully stated a claim, we address this question first. *See, e.g., Byrd v. Guess,* 137 F.3d 1126, 1131 (9th Cir.1998) (ruling that the failure to demonstrate Fourth Amendment standing precludes claim regardless of its potential merits); *see also Steel Co. v. Citizens for a Better Env't,* —— U.S. ——, ——–——, 118 S.Ct. 1003, 1012–16, 140 L.Ed.2d 210 (1998) (finding that standing challenges should be resolved prior to merits of case).

### A. *Fourth Amendment Claim*

■■■ "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Thus, the general rule is that only the person whose Fourth Amendment rights were violated can sue to vindicate those rights. *Smith v. City of Fontana,* 818 F.2d 1411, 1417 (9th Cir.1987). In § 1983 actions, however, the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action. 42 U.S.C. § 1988(a); *Smith,* 818 F.2d at 1416–17. The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action. *Byrd,* 137 F.3d at 1131.

The district court correctly ruled that Appellants failed to carry this burden. Nevada law provides for the survival of a cause of action for injuries suffered by an individual who dies before judgment is rendered. *See* Nev.Rev.Stat. § 41.100(3).[2] However,

---

gunfight. We express no view on whether this evidence was sufficient to create an issue of fact

on the question of whether Douglas was the person Burns intended to shoot.

**2.** In relevant part, § 41.100(3) states:

§ 41.100(3) extends the right to bring a survival action only to the official representatives of an individual's estate; no mention is made of a similar right extending to family members or heirs to bring a survival action independent or in lieu of the estate's claim. *Compare, e.g.,* Cal.Civ.Proc.Code § 377.60 (authorizing causes of action to be brought by decedent's personal representative "or" any of a defined list of persons that includes a decedent's spouse, children, or heirs), with Nev.Rev.Stat. § 41.100(3) (mentioning only the right of a decedent's "executor or administrator" to pursue a cause of action). Moreover, in the same chapter of Nevada's code, the Nevada legislature signaled its recognition of the distinction between an estate representative and a decedent's heirs by granting both heirs and estate representatives the right to bring a state law wrongful death cause of action. See Nev.Rev.Stat. § 41.085.[3] The Nevada legislature's decision to mention only estate representatives in § 41.100(3) leads naturally to the conclusion that the right to bring a survival action in Nevada is limited to the duly appointed representatives of a deceased's estate.

Here, as in *Byrd,* Appellants did not allege in their complaint that they brought their claims in a representative capacity. Further, at no time in the action before the district court did Appellants argue or offer any evidence they had been formally appointed as representatives of Douglas's estate. In fact, in at least one deposition, counsel for Appellants expressly acknowledged that no claims were being made on behalf of Douglas's estate. Given this record, the district court did not err in dismissing Appellants' Fourth Amendment claim.

---

**3.** In relevant part, § 41.085(2) states:

[W]hen a person who has a cause of action dies before judgment, the damages recoverable by his executor or administrator include all losses or damages which the decedent incurred or sustained before his death, including any penalties or punitive and exemplary damages which the decedent would have recovered if he had lived, and damages for pain, suffering or disfigurement and loss of probable support, companionship, society, comfort and consortium.

---

### B. *Inquest Testimony Claims*

The district court also correctly concluded that Appellants lacked standing to pursue their Fourteenth Amendment-based due process and equal protection claims relating to Burns's and Pope's inquest testimony about Douglas and the shooting.

■ Addressing Appellants' due process theory first, it appears to be an open question whether allegations of perjury, without more, state a due process claim under § 1983. *See, e.g., Briscoe v. LaHue,* 460 U.S. 325, 326 n. 1, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) ("The Court has held that the prosecutor's knowing use of perjured testimony violates due process, but has not held that the false testimony of a police officer in itself violates constitutional rights."); *Holt v. Castaneda,* 832 F.2d 123, 125 (9th Cir.1987) (finding an officer to be entitled to absolute immunity for any constitutional violation caused by perjurious testimony against plaintiff); *see also White v. Frank,* 855 F.2d 956, 961–62 (2d Cir.1988) (holding that an officer who initiates baseless prosecution by committing perjury may be liable for malicious prosecution). We need not resolve this question today for Appellants have not demonstrated they have standing to assert such a claim even if such a right exists.

■ The Fourteenth Amendment's Due Process Clause extends only to those governmental actions that deprive one of a life, liberty, or property interest of constitutional magnitude. *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Wedges/Ledges of Cal., Inc. v. City of Phoenix,* 24 F.3d 56, 62 (1994). Here, Appellants identified no life, liberty, or property interest of which they were deprived by the officers' testimony. That

---

When the death of any person, whether or not a minor, is caused by the wrongful act or neglect of another, the heirs of the decedent *and* the personal representatives of the decedent may *each* maintain an action for damages against the person who caused the death, or if the wrongdoer is dead, against his personal representatives, whether the wrongdoer died before or after the death of the person he injured.

(emphasis added).

leaves only any potential claim that might exist on behalf of Douglas's estate. Assuming, *arguendo*, that the estate of a person who is the subject of perjury after death can state such a claim, Appellants are barred from asserting that claim for the same reasons that preclude them from asserting Douglas's potential Fourth Amendment claim.

■■■ A slightly different analysis controls Appellants' equal protection theory. Citing *Smith v. Ross*, 482 F.2d 33 (6th Cir.1973), Appellants contend Burns and Pope violated their duty to enforce equally Nevada's statutes that make it unlawful for individuals to commit perjury or to falsely report that a person has committed a crime. *See* Nev. Rev.Stat. §§ 199.120 & 207.280.

■■■ In *Smith,* the state actor in question was a local deputy who attempted to have an interracial group evicted without a legal basis and threatened to withdraw police protection for them unless they left town. This type of conduct—an intentional, race-motivated refusal to enforce laws intended for the protection of the general populace—poses a clear equal protection issue. In contrast, Appellants allege Burns and Pope violated state laws applicable to themselves, not that discriminatory animus motivated them to decline to enforce generally applicable laws. Such violations may give rise to liability under state law, but state law violations do not, on their own, give rise to liability under § 1983. *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 370–71 (9th Cir.1996). Moreover, Appellants cite no authority for the proposition that these laws were intended to protect family members of a perjury victim. Finally, even if this theory of relief would support a claim by the estate of a decedent who has been the subject of an officers' false report or testimony, Appellants have not

demonstrated they have standing to present such a claim.

In sum, even if Appellants' allegations are taken as true, they have not demonstrated their own rights to due process and to equal protection of the laws that have been infringed, or that they are able to stand in Douglas's place as to any violations of his constitutional rights inflicted by the officers' testimony.

## IV.

■■■ Regardless of whether Appellants have standing to assert a Fourth Amendment claim based on Douglas's death, they each may assert a Fourteenth Amendment claim based on the related deprivation of their liberty interest arising out of their relationship with Douglas. *Byrd,* 137 F.3d at 1133–34. This substantive due process claim may be asserted by both the parents and children of a person killed by law enforcement officers. *Curnow v. Ridgecrest Police,* 952 F.2d 321, 325 (9th Cir.1991).

■■■ The district court recognized this subtle distinction in the types of potential constitutional causes of action that flow from a state official's killing of a person. Adopting the parties' presentation of this case, however, the district court erroneously analyzed Appellants' substantive due process claim under the Fourth Amendment's "objective reasonableness" standard. *See Byrd,* 137 F.3d at 1134 (noting that Fourth Amendment and substantive due process based § 1983 claims are governed by distinct standards). Nonetheless, the district court did not err in granting judgment on this claim. As we explain below, Appellants are not entitled to prevail on this claim even if their theory of this case—that Burns missed the shooter and shot a bystander—reflects what actually occurred in the Chances Arr parking lot on September 18, 1993.[4]

---

4. We do not reach the qualified immunity question on which the district court based its decision because "the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *County of Sacramento v. Lewis,* —— U.S. ——, —— n. 5, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998). However, if the district

court correctly determined Burns's actions were objectively reasonable, it follows that his conduct did not offend the more stringent standard applicable to substantive due process claims. The reverse does not necessarily hold true, as it may be possible for an officer's conduct to be objectively unreasonable yet still not infringe the more demanding standard that governs substantive due process claims. *Id.* at 1721.

The United States Supreme Court recently considered the standard of culpability applicable to substantive due process claims arising from the unintentional killing of an individual by law enforcement officers. *See County of Sacramento v. Lewis,* ——— U.S. ———, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Noting that the plaintiffs in *Lewis* contended only that the officers had acted in "conscious disregard" of the individual's life, the Supreme Court held this allegation did not rise to the level of culpability necessary to implicate a substantive due process theory of relief. *Id.* at 1721. Instead, the Court held that "in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *Id.* at 1711–12. The question we face today is whether this newly minted explanation of the "shocks the conscience" standard also controls in cases where it is alleged that an officer inadvertently harmed a bystander while responding to a situation in which the officer was required to act quickly to prevent an individual from threatening the lives of others. We conclude that it does.

While the Supreme Court limited its holding in *Lewis* to the facts of that case (*i.e.,* to high-speed police chases), there is no principled way to distinguish such circumstances from this case. Reasoning by analogy from its previous recognition that different types of conduct implicate different culpability standards under the Eighth Amendment, the Court extensively discussed the question of what states of mind trigger the "shocks the conscience" standard that governs substantive due process claims arising from executive action. *Id.* at 1718–20; *see also Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (holding that Eighth Amendment claims based on medical care are governed by different culpability standard than claims involving harm inflicted by officers responding to prison disturbances). Expressly declining to draw a bright line rule, the Court described the critical consideration as whether the circumstances are such that "actual deliberation is practical." *Lewis,* 118 S.Ct. at 1719. Focusing on the fact that police officers often are required to "act decisively" and make decisions "in haste, under pressure, and frequently without the luxury of a second chance," the Court explained:

> [W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates "the large concerns of the governors and the governed." Just as a purpose to cause harm is needed for Eighth Amendment liability in a riot case, so it ought to be needed for Due Process liability in a pursuit case.

*Id.* at 1720 (internal citation omitted).

This rationale applies with equal force to the circumstances faced by Burns and Pope. When Burns and Pope arrived at the Chances Arr bar, the gunfight in progress threatened the lives of the 50 to 100 people who were trapped in the parking lot. In other words, Burns and Pope were required to "act decisively," "without the luxury of a second chance" to address a life-threatening situation. Had Burns and Pope failed to attempt to disable the male in the parking lot when he refused to comply with their commands to stop firing, they would have failed to address the immediate risk of serious harm or death to the many innocent individuals trapped in the parking lot, as well as the threat the combatants posed to themselves. In such circumstances, the argument for application of the "purpose to commit harm" standard is even more compelling than it was in *Lewis,* given the stronger parallels that exist with the prison disturbance context from which this standard was drawn. Indeed, this analogy, which the Supreme Court found "hard to avoid" with respect to police chases, *id.,* is inescapable in the type of situation addressed here.

This conclusion also is consistent with this circuit's prior precedents and the decisions of other circuits that have applied *Lewis.* In *Byrd,* 137 F.3d at 1126, this court addressed the question of whether the substantive due process standard in a claim brought by the mother and widow of an individual killed by law enforcement officers differed from the standard governing a case brought by the

estate of an individual killed in a high-speed police chase. Relying on its earlier decision in *Lewis*, this court held that both of these situations are governed by the same standard of culpability. *Id.* at 1133–34. Though that standard ultimately was rejected by the Supreme Court in *Lewis*, *Byrd* continues to stand for the proposition that the same level of culpability is implicated by these two types of substantive due process claims. Furthermore, each of the circuits that has interpreted and applied this aspect of the *Lewis* decision has recognized that the critical question in determining the appropriate standard of culpability is whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct. *See Armstrong v. Squadrito*, 152 F.3d 564, 576–82 (7th Cir.1998) (applying *Lewis's* standard of culpability reasoning to a substantive due process claim based on prolonged unlawful detention); *Medeiros v. O'Connell*, 150 F.3d 164, 169–70 (2d Cir.1998) (applying *Lewis* in accidental shooting case); *Radecki v. Barela*, 146 F.3d 1227, 1231–32 (10th Cir. 1998) (holding that *Lewis's* "purpose to commit harm" standard applies to all cases involving "emergency situations").

Accordingly, we hold that Las Vegas police officers Burns and Pope did not violate the plaintiffs' substantive due process rights to family association when they accidentally shot and killed Douglas, because the officers were responding to the extreme emergency of public gunfire and did not intend to commit any harm unrelated to the legitimate use of force necessary to protect the public and themselves.

Viewed through this prism, it is apparent Appellants cannot prevail under their theory of this case. Appellants do not contend Burns intended to harm Douglas, physically or otherwise. Nor do Appellants dispute that Burns was entitled to use deadly force to halt the gunfight occurring in the Chances Arr parking lot. Instead, Appellants simply contend that the officers shot a bystander, and that this creates a triable issue as to whether the officers acted recklessly or with gross negligence. Even if all this is true, Appellants have failed to state a viable substantive due process claim because these matters are not material to the controlling question of whether Burns acted with a purpose to harm Douglas that was unrelated to his attempt to stop the male in the parking lot from endangering others. *See, e.g., Lewis*, 118 S.Ct. at 1720–21 (holding that allegations that officers acted in "conscious disregard" of decedent's right to life failed to state substantive due process claim).

Thus, the district court's judgment is affirmed on this claim, along with the claims that Appellants lack standing to assert. This determination extends to Appellee Metro as well because Appellants do not contend Metro is liable under a theory of relief independent of those asserted against Burns and Pope. *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam); *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 972, 136 L.Ed.2d 856 (1997).

V.

The district court also granted judgment to Appellees on Appellants' state law claims for wrongful death and intentional infliction of emotional distress. As with Appellants' federal claims, we affirm the district court's decision.

■ As is often the case in these types of hybrid § 1983/state tort law cases, the proceedings in the court below focused almost exclusively on Appellants' federal claims. For a plaintiff, this is almost always a strategic error because the clear instruction of cases like *Lewis* is that state law avenues for relief are substantially broader than those available under the federal constitution through § 1983. Here, for example, Appellants' gross negligence/recklessness theory of this case conceivably could have entitled them to proceed to trial under Nevada's statutory wrongful death cause of action. Appellants, however, failed to present this argument to either the district court or this court. Instead, Appellants argued only that they have standing to bring a wrongful death cause of action under Nev.Rev.Stat. § 41.085. This may be so, but the district court ruled that Burns's shooting of Douglas was not wrongful, not that they lacked standing to bring this claim. Appellants' failure to chal-

lenge this ruling waived any argument that their evidence was sufficient to proceed to trial on their state law wrongful death cause of action. *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.,* 122 F.3d 1211, 1217 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1302, 140 L.Ed.2d 468 (1998).

█ The district court also correctly granted summary judgment on Appellants' intentional infliction of emotional distress claim. Although the complaint is silent as to what conduct provides the basis for this claim, Appellants' arguments below and on appeal make clear that this claim relates to Burns's and Pope's allegedly perjurious testimony at the coroner's inquest. Under Nevada law, Appellants were required to identify sufficient evidence to create a triable issue both as to whether Burns and Pope at least recklessly disregarded the possibility that their testimony would cause Appellants' emotional distress, and whether Appellants suffered emotional distress as a result. *Star v. Rabello,* 97 Nev. 124, 625 P.2d 90, 91 (1981). Instead of presenting or identifying evidence that would support a rational inference in their favor on these elements, Appellants rely solely on the allegations of their complaint to support the assertion that Burns and Pope must have caused, and intended to cause, emotional distress to Appellants. Absent supporting evidence, allegations such as these are insufficient to carry a plaintiff's burden on summary judgment of identifying sufficient *evidence* to establish a genuine issue of material fact on a challenged element of a claim. Thus, the district court correctly determined Appellants were not entitled to proceed to trial on this cause of action.

## VI.

The district court's judgment is affirmed. The parties shall bear their costs and fees on appeal.

**AFFIRMED.**