IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Daryl Cook,                          :
                    Appellant        :
                                     :    No.  572 C.D. 2019
             v.                      :
                                     :    Submitted:  September 13, 2019
Robert Smith                         :


*OPINION NOT REPORTED*

MEMORANDUM OPINION
PER CURIAM                                          FILED:  February 7, 2020


Daryl Cook appeals, *pro se*, from the February 12, 2019 order of the Court of Common Pleas of Lycoming County (trial court), which granted summary judgment on Cook's civil complaint (Complaint) against Robert Smith, then Superintendent (Superintendent) of the State Correctional Institution at Muncy (SCI-Muncy).


**Background**

Cook filed his Complaint in the trial court on August 14, 2017, naming Superintendent as the sole defendant.  (Complaint, Original Record (O.R.) at Item No. 1.)  As alleged in the Complaint, at all times relevant Cook was then an inmate incarcerated at SCI-Fayette.  (Complaint ¶4.)  On July 28, 2015, Cook received approval to send a $300.00 check to his daughter, Khalia Landers, who was then an inmate incarcerated at SCI-Muncy.  *Id.* ¶¶6-7.  Although Cook was approved to send the money to Landers, on August 12, 2015, the check was returned to him.  *Id.* ¶7. Superintendent allegedly told Landers that the money was not placed in her prison account because he had not approved the transfer.  *Id.* at ¶8.  Cook alleged that because the $300.00 was not placed in Landers' prison account, he sent a letter to

Superintendent on September 29, 2016, requesting to know why Landers was not allowed to receive the money, who was responsible for returning Cook's money to him, and who decided to not notify Landers that the money was sent. *Id.* However, according to the Complaint, Superintendent never responded to the letter. *Id.*

Cook alleged that due to Landers not receiving the money, he and his daughter had a falling out because they each believed the other was lying about having sent and/or received the money. *Id.* ¶9. Cook averred that Superintendent acted in bad faith by not allowing Landers to receive the money and not responding to Cook's letter, which caused Cook to suffer "intentional infliction of emotional distress," "bad reputation," "defamation of character," "loss of consortium with his daughter," "loss of association with his daughter's sister," "loss of family bond," "loss of money," "loss of sleep," "loss of appetite," "loss of privacy," "loss of freedom of choice," "loss of property rights," "tortious interference of property rights," and "cruel and unusual punishment in violation of state common law, and [Cook's] rights and protections under the First, Fourth, Eighth, [and] Fourteenth Amendment[s] to the Constitution of the United States and 42 U.S.C. §1983." *Id.* ¶¶10-11. Cook sought a declaratory judgment declaring that he had a right to send the money to Landers and that Superintendent violated his rights under "state law and [the] Constitution and law of the United States." *Id.* ¶12. Cook sought compensatory damages in the amount of $1,500,000.00 and punitive damages in the amount of $3,000,000.00. *Id.* ¶13.

Cook did not serve the Complaint within 30 days of filing it and twice had to have it reinstated. Cook finally served Superintendent on November 14, 2017; however, Cook did not serve the Office of Attorney General (OAG). Superintendent did not timely answer the Complaint and on December 12, 2017, Cook served Superintendent with a notice of praecipe to enter default judgment. On December 27, 2017, the OAG, on behalf of Superintendent, filed an answer to the Complaint. On January 10, 2018, Cook filed a praecipe for default judgment and the trial court

2

prothonotary entered a default judgment against Superintendent. However, that same day, Superintendent filed a petition to open the default judgment. In an opinion and order dated February 9, 2018, the trial court struck the default judgment due to "multiple defects on the face of the record." (O.R. at Item No. 19.) In the same opinion and order, the trial court placed the matter on the January-March 2019 trial term as a non-jury trial and ordered discovery to be completed by October 19, 2018.

The parties then proceeded to discovery. On June 4, 2018, Cook filed a motion for sanctions or to compel discovery (First Motion for Sanctions). On September 17, 2018, the trial court granted the motion in part, ordering Superintendent to (1) provide Cook with any grievances filed by Landers, and the results thereof; and (2) answer Cook's question as to whether Cook complied with Department of Corrections (DOC) policy in his request and, if not, provide information on the section of DOC policy that was violated. (O.R. at Item No. 25.) The trial court concluded that the remaining objections were rendered moot as a result of Landers' release from state prison and/or the answers provided were sufficient. *Id.*

On December 7, 2018, Superintendent filed a motion for summary judgment. Superintendent argued that summary judgment was warranted because Cook failed to exhaust administrative remedies by not filing a prison grievance for the matter and failed to state a claim for which relief could be granted. On December 10, 2018, Cook filed a motion for sanctions or judgment on the pleadings (Second Motion for Sanctions). Cook claimed that Superintendent had not complied with the discovery order because he did not produce a DOC policy justifying the reason why Landers was denied the money. Cook requested that the trial court order Superintendent to produce such a policy as well as Landers' request for approval to receive the check. Cook also filed a brief in opposition to Superintendent's motion for summary judgment, arguing that there were no administrative remedies available because Superintendent never responded to the informal letter request sent to him; Superintendent did not have a valid

3

reason for refusing to approve Landers' receipt of Cook's check; and DOC policy did not apply to a family member and/or violated the United States Constitution.

Following a hearing, the trial court granted Superintendent's motion for summary judgment in an opinion and order dated February 12, 2019. The trial court concluded that, pursuant to the Federal Prison Litigation Reform Act, 42 U.S.C. §1997e, and section 6603 of the Pennsylvania Prison Litigation Reform Act, 42 Pa.C.S. §6603, a prisoner must exhaust administrative remedies before he can pursue a civil action in court. (Trial court op. at 4.) The trial court concluded that Cook failed to exhaust administrative remedies and, therefore, dismissed his state and federal claims. The court noted that although DOC's inmate grievance system encourages inmates to resolve issues by filing informal requests, the grievance system requires that inmates file formal grievances with the Facility Grievance Coordinator, regardless of whether the inmate's informal request resolved the issue. Thus, the court determined that even if Cook's September 29, 2016 letter to Superintendent were deemed an informal request under the grievance system, Superintendent's failure to respond did not absolve Cook of his duty to file a formal grievance. (Trial court op. at 5.)

Additionally, the trial court concluded that even if Cook had exhausted administrative remedies, Cook failed to state a claim on which relief could be granted because it was undisputed that his check was returned to him, which meant that he had not been deprived of a constitutionally protected property interest. The trial court also reasoned that DOC policy requires both the inmate sending mail and the inmate receiving mail to acquire approval before the mail can be properly processed and that Landers did not obtain approval to receive the check. *Id.*

After Cook filed his notice of appeal, the trial court directed him to file a concise statement of errors complained of on appeal. In his statement, Cook challenged the trial court's decisions to strike the default judgment, deny the Second Motion for Sanctions, and grant Superintendent's motion for summary judgment. In an order

4

dated June 4, 2019, the trial court stated that it was satisfied that its February 9, 2018 and February 12, 2019 opinions and orders sufficiently addressed the issues on appeal. (O.R. at Item No. 48.) The trial court also noted that Cook's Second Motion for Sanctions was implicitly overruled by the trial court's February 12, 2019 opinion and order, as well as Cook's own response in opposition to summary judgment. *Id.* The trial court explained that in his opposition to summary judgment, Cook had attached a letter from the OAG that complied with the Court's September 17, 2018 discovery order. *Id.* Based on the attachments to the opposition to summary judgment, the trial court determined that on November 5, 2018, the OAG provided Cook with the documents that Cook averred in the Second Motion for Sanctions had not been delivered to him. *Id.*

## Discussion

On appeal, Cook argues that the trial court erred and/or abused its discretion in (1) striking the default judgment; (2) denying Cook's Second Motion for Sanctions; (3) granting Superintendent's motion for summary judgment for failure to exhaust administrative remedies; and (4) granting Superintendent's motion for summary judgment for failure to state a claim.[1]

---

[1] This Court's review of a grant of a petition to strike a default judgment is limited to whether the trial court committed an error of law. *City of Philadelphia v. David J. Lane Advertising, Inc.*, 33 A.3d 674, 677 n.6. (Pa. Cmwlth. 2011). "Orders regarding discovery matters are subject to the discretion of the trial court." *Hill v. Kilgallen*, 108 A.3d 934, 941 (Pa. Cmwlth. 2015). Generally, "the imposition of sanctions for a party's failure to comply with a trial court's discovery orders is left to the discretion of the trial court as are the sanctions themselves." *Id.* This court "will not disturb discovery orders without a showing of manifest[] unreasonableness, partiality, prejudice, bias, ill will, or such lack of support in the law or record for the [trial court's action] to be clearly erroneous." *Id.* (internal quotation marks omitted).

Further, "[o]n appeal from a trial court's order granting or denying summary judgment our standard of review is de novo and our scope of review is plenary." *Brewington v. City of Philadelphia*, 149 A.3d 901, 904 n.3 (Pa. Cmwlth. 2016), *aff'd sub nom. Brewington for Brewington v. City of*

We first address whether the trial court erred in striking the default judgment. Cook contends that the OAG received actual notice of his lawsuit, thus negating the fact that he did not serve the OAG with his Complaint. He alleges that the lack of technical compliance with the service of process rules did not result in any disadvantage or prejudice to the OAG because the OAG received actual notice. Cook also argues that because he was incarcerated, the sheriff should have been required to serve the OAG and/or should have been required to inform Cook that he was required to serve the OAG.

Under Pennsylvania law, if there is a defect on the record as of the date the default judgment was entered, *i.e.*, one so obvious that it is apparent from the face of the court record, then the default judgment must be stricken. *Kreidie v. Department of Revenue*, 156 A.3d 380, 383 (Pa. Cmwlth. 2017). As pertains to the instant matter, both section 8523(b) of the Pennsylvania Judicial Code, 42 Pa.C.S. §8523(b), and Rule 422(a) of the Pennsylvania Rules of Civil Procedure, Pa.R.C.P. No. 422(b), direct a party serving process on any Commonwealth party to also serve it on the OAG. Where a party fails to serve the OAG as required by 42 Pa.C.S. §8523(b) and Pa.R.C.P. No. 422(b), such a failure "cannot be overlooked," "cannot be excused," and "cannot be waived," and, therefore, constitutes a "fatal defect appearing on the face of the record" at the time a default judgment is entered. *Kreidie*, 156 A.3d at 383-84; *see also Mazur v. Cuthbert*, 186 A.3d 490, 496-97 (Pa. Cmwlth.) (concluding that service of the complaint on the OAG is an "absolute prerequisite to the entry of a default judgment against a Commonwealth party"), *appeal denied*, 198 A.3d 1052 (Pa. 2018).

---

*Philadelphia*, 199 A.3d 348 (Pa. 2018). Summary judgment is only appropriate "when, after examining the record in the light most favorable to the non-moving party, and resolving of all doubts as to the existence of a genuine issue of material fact against the moving party, the moving party is clearly entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted).

6

Here, the record shows that Cook did not serve the OAG with the Complaint. *See* O.R. at Item Nos. 1, 5, 8-10. Cook argues that the OAG had actual notice of the Complaint based on a letter attached to the Complaint, dated September 29, 2016, which he allegedly sent to the OAG nearly a year before filing the Complaint to advise the OAG that he intended to file a lawsuit. However, the record is devoid of evidence that this letter was actually sent by Cook or received by the OAG. Further, even if the OAG had received the letter exhibiting Cook's intention to file suit, it is irrelevant; process of service on the OAG is *mandatory* and cannot be waived or excused. *Mazur*, 186 A.3d 496-97; *Kreidie*, 156 A.3d at 383-84. The sheriff also had no affirmative duty to serve the OAG with the Complaint where not directed to do so by Cook. *See Fraisar v. Gillis*, 892 A.2d 74, 76 (Pa. Cmwlth. 2006) (explaining that court functionaries have no duty to accomplish service for a *pro se* litigant or to instruct *pro se* litigants on the rules of civil procedure). Accordingly, because Cook's failure to serve the OAG with his Complaint was a facial defect, the trial court did not err in striking the default judgment.[2]

Next, we address whether the trial court erred in denying Cook's Second Motion for Sanctions. Cook maintains that, despite the trial court's discovery order directing Superintendent to provide him with certain documents and answers to his interrogatories, Superintendent failed and refused to comply with the order. In

---

[2] Additionally, it appears from the record that the answer to the Complaint was filed *before* Cook filed his praecipe for default judgment. *See* O.R. Item Nos. 11, 15. Pennsylvania courts have generally held that where an untimely answer is filed *before* the filing of a praecipe for default judgment, it will bar the entry of a default judgment because once the answer is filed the responding party is no longer in default. *See Mazur*, 186 A.3d at 496-97; *Vision Service Plan of Pennsylvania v. Pennsylvania AFSCME Health & Welfare Fund*, 474 A.2d 339, 341 (Pa. Super. 1984). Here, it appears the answer to the Complaint was filed December 29, 2017, (O.R. at Item No. 11), and the praecipe to enter default judgment was filed on January 10, 2018 (O.R. at Item No. 15). Hence, because the answer was filed before the praecipe for default judgment, the trial court correctly struck the default judgment.

7

particular, Cook alleges that Superintendent did not provide documents, including any informal communications, that Landers submitted requesting to know the reason why the money transfer was denied, and did not provide Cook with the DOC policy relied on by Superintendent for withholding the transfer. Cook contends that he was prejudiced by the trial court not granting and/or ruling on his Second Motion for Sanctions prior to granting Superintendent's motion for summary judgment.

"Orders regarding discovery matters are subject to the discretion of the trial court." *Hill*, 108 A.3d at 941. Generally, "the imposition of sanctions for a party's failure to comply with a trial court's discovery orders is left to the discretion of the trial court as are the sanctions themselves." *Id.* This Court "will not disturb discovery orders without a showing of manifest[] unreasonableness, partiality, prejudice, bias, ill will, or such lack of support in the law or record for the [trial court's action] to be clearly erroneous." *Id.* (internal quotation marks omitted).

We observe that in its September 17, 2018 order granting in part Cook's motion to compel, the trial court, in relevant part, ordered Superintendent to provide Cook "with the grievances filed by Miss Landers, and the results thereof." (O.R. at Item No 25.) The trial court also directed Superintendent's attorney to answer Cook's "question as to whether [Cook] complied with prison policy in his request" and, if not, ordered Superintendent to "provide information as to the section of prison policy which was violated in not allowing the transfer of money to take place." *Id.* The court concluded that the remaining objections were rendered moot as a result of Landers' release from state prison and, therefore, that the previous discovery responses provided by Superintendent were sufficient. *Id.*

The trial court concluded in its June 4, 2019 order that Superintendent complied with its discovery order. We agree. Cook's opposition to Superintendent's motion for summary judgment contained a letter from Superintendent's counsel that was written in response to the trial court's discovery order. (O.R. at Item No. 34.) The

8

letter stated that Cook complied with DOC policy by requesting permission to transfer the money to Landers. Attached to the letter were six pages of grievances filed by Landers, and DOC's responses thereto, concerning Landers' request for the money transfer. *Id.* The responses contained DOC's reasons for denying the transfer, including DOC's determination that Landers had sufficient money in her account to satisfy her needs. *Id.* Because the letter advised Cook whether he had complied with DOC policy in requesting the transfer and provided the grievances submitted by Landers, Superintendent substantially complied with the discovery order. While Cook appears to fault Superintendent for not providing him any informal communications from Landers to DOC, the discovery order did not order the production of such documents; accordingly, we are unable to construe Superintendent's failure to produce such documents as a violation of the order.

To the extent that the discovery order required Superintendent to provide a copy of the policy he relied upon in not approving the transfer between Cook and Landers, we note that Superintendent's response did not produce or identify a particular policy. However, since Superintendent indicated in his discovery response that Cook did not violate a policy, pursuant to the trial court's order Superintendent was arguably not required to produce a policy.

Regardless, even if the order is construed as requiring Superintendent to produce the policy, Cook's filings during the litigation of this matter demonstrate that he was well aware of the policy governing money transfers to inmates. The Complaint references the DOC policy governing such transfers, DOC Policy DC-ADM 803 §1(A)(3)(b), and the policy itself is attached to the Complaint. (Complaint ¶7, Exhibit B.) Superintendent's response to Cook's discovery requests reiterated the policy, noting that "[t]he transfer of funds from one SCI to another is a two-party process. If the recipient does not have approval to receive the funds, they must be returned to the sender." (O.R. at Item No. 22.) Moreover, Superintendent's motion for summary

9

judgment contained a discussion and copy of the policy, and Cook's opposition to summary judgment discusses his belief that the policy is inapplicable to him.[3] (O.R. at Item Nos. 30, 34.) Because Cook was already aware of the policy relied on by Superintendent (and even had a copy of the policy), the information sought through discovery was neither material to Cook's case or the motion for summary judgment in the evidentiary sense. *See, e.g.*, *Reeves v. Middletown Athletic Association*, 866 A.2d 1115, 1124 (Pa. Super. 2004) (concluding that a party opposing summary judgment on the ground that he was not afforded a reasonable time to complete discovery is under an obligation to show that the information sought was *material* to the case); *Kerns v. Methodist Hospital*, 574 A.2d 1068, 1074 (Pa. Super. 1990) (same).

Because Cook already had a copy of the policy at issue, Superintendent's failure to produce the policy was not material to the motion for summary judgment, and Superintendent otherwise complied with the trial court's discovery order, the trial court's decision to deny the Second Motion for Sanctions was not manifestly unreasonable or "clearly erroneous." *Hill*, 108 A.3d at 941. Thus, we are unable to conclude that the trial court abused its discretion in denying the motion.

Next, we address whether the trial court erred in granting Superintendent's motion for summary judgment, based on Cook's failure to exhaust administrative remedies. Cook argues that after he sent Superintendent a letter asking him to transfer the money to Landers, Superintendent had a duty to quickly and informally resolve Cook's concern or to refer Cook to an appropriate staff member to resolve the concern. As a result of Superintendent not responding to the letter, Cook alleges that Superintendent elected to not make the grievance system available to him. Cook also maintains that the grievance system was not available to him because he did not know where to file a grievance and was not told that he had to file a grievance. Cook further

---

[3] Cook has also attached a copy of the relevant policy to his brief filed with this Court.

argues that the grievance system was inadequate and ineffective as a result of Superintendent's failure to respond to his letter and provide the reasons why the money was returned to him.

Pursuant to section (a) of the Federal Prison Litigation Reform Act, titled "Applicability of administrative remedies," "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. §1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). In addition, section 6603(a) of the Pennsylvania Prison Litigation Reform Act, titled "Limitations on remedies for Federal claims," provides as follows: "Prison conditions litigation[4] filed in or remanded to a court of this Commonwealth *alleging in whole or in part a violation of Federal law* shall be subject to any limitations on remedies established by Federal law or Federal courts with respect to the Federal claims." 42 Pa.C.S. §6603(a) (emphasis added).

Under the Pennsylvania Litigation Reform Act, "when federal claims are asserted, exhaustion is mandatory." *Kittrell v. Watson*, 88 A.3d 1091, 1095 (Pa. Cmwlth. 2014). Exhaustion must also follow the proper procedures. *Id.* "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* Therefore, an inmate is required to use all steps that the agency holds out. *Id.* One "necessary corollary to the requirement" that an inmate follow administrative procedures is that if an agency prevents the inmate from pursuing a policy, the agency does not "hold out a

---

[4] Pennsylvania law defines prison conditions litigation as "a civil proceeding arising in whole or in part under Federal or State law with respect to the conditions of confinement or the effects of actions by a government party on the life of an individual confined in prison." Section 6601 of the Pennsylvania Prison Litigation Reform Act, 42 Pa.C.S. §6601.

remedy," and, therefore, the remedy cannot be exhausted. *Minor v. Kraynak*, 155 A.3d 114, 125 (Pa. Cmwlth. 2017). Inmates are only required to exhaust such administrative remedies as are available. *Id.* Yet, "the exhaustion requirement may not be avoided on the grounds that filing a grievance would be futile or the relief that could be granted by the grievance would be inadequate." *Salter v. Lamas* (Pa. Cmwlth., No. 369 C.D. 2013, filed October 4, 2013), slip op. at 12.[5]

Here, DOC's Inmate Grievance System, set forth in DOC Policy DC-ADM 804, "is intended to deal with a wide range of issues, procedures, or events that may be of concern to an inmate." DC-ADM 804.[6] Prior to utilizing the grievance policy set forth in DC-ADM 804, however, "[a]n inmate is encouraged to attempt resolution of a concern informally." *Id.* The staff member who receives an informal written concern is "encouraged, *when possible*, to resolve every concern quickly and informally." *Id.* (emphasis added).

When an inmate has a concern that he is unable to resolve informally, he must then utilize the grievance process. DC-ADM 804 §1.A.5. The inmate grievance process contains three steps. In Step 1, within 15 working days of an incident an inmate must submit the initial grievance to the Facility Grievance Coordinator, who in turn has 15 days to provide a written response. DC-ADM 804 §1.A, C. In Step 2, an inmate has 15 days from receipt of the grievance response to appeal it to the Facility Manager or Superintendent, who in turn must notify the inmate of his decision within 15 days of receiving the appeal. DC-ADM 804 §2.A. If still dissatisfied, in Step 3 the inmate has 15 days from receipt of the appeal response to submit a final appeal to DOC's Office

---

[5] Pursuant to this Court's Internal Operating Procedures, an unreported opinion of the Court filed after January 15, 2008, may be cited for its persuasive value. 210 Pa. Code §69.414(a).

[6] DC-ADM 804 is available on DOC's website at: https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/804%20Inmate%20Grievances.pdf (last visited February 3, 2020).

12

of Inmate Grievances and Appeals, which in turn has 30 days to respond to the inmate. DC-ADM 804 §2.B. The grievance process culminates with the Office of Inmate Grievances and Appeals' response. *Id.*

In the instant matter, although Cook attempted to resolve his concern regarding the transfer of the funds informally, by sending a letter to Superintendent on September 29, 2016, it is undisputed that he never filed a formal grievance pursuant to DC-ADM 804. Cook argues that Superintendent's failure to respond to his letter absolved him of his duty to submit a formal grievance. However, DC-ADM 804 encourages, but does not require, DOC officials to resolve inmate concerns informally. Therefore, the fact that Cook attempted to resolve the matter informally and did not receive a response did not render the grievance process unavailable to him. *See, e.g., Starcloud v. Kauffman* (Pa. Cmwlth., No. 332 M.D. 2017, filed June 8, 2018), slip op. at 6 (dismissing petition because, while the inmate had attempted to resolve his concern informally, he did not submit an official grievance and, thus, had failed to exhaust administrative remedies). Nor has Cook demonstrated that after sending his informal letter he was prevented from filing a grievance, that the process was made unavailable to him, or that the process was inadequate to remedy his grievance.[7]

Pursuant to the Federal Prison Litigation Reform Act and 6603(a) of the Pennsylvania Prison Litigation Reform Act, because Cook's lawsuit was at least in part based on federal law, *i.e.*, 42 U.S.C. §1983, Cook was required to exhaust administrative remedies before filing suit. *See Kittrell*, 88 A.3d at 1093. Cook failed

---

[7] Cook also argues that he did not know where to file a grievance; however, DC-ADM 804 §1.A, states that a grievance should be filed with the Facility Grievance Coordinator/designee at the facility where the grievance event occurred. As evidenced by Cook's letter to Superintendent, which was attached to the Complaint, *see* Complaint, Exhibit B, Cook was aware his money was returned to him because the transfer was not approved by Superintendent and, thus, that the grievance event occurred at SCI-Muncy.

13

to utilize DOC's grievance process before filing suit; accordingly, we are constrained to affirm the trial court's order granting Superintendent's motion for summary judgment based on Cook's failure to exhaust administrative remedies.

However, even if we did not affirm the trial court's order on that basis, we would affirm the trial court's order based on Cook's failure to state a valid claim.

Citing *Santosky v. Kramer*, 455 U.S. 745 (1982), *Quilloin v. Walcott*, 434 U.S. 246 (1978), and *Harris v. Donahue*, 175 F. App'x 746 (7th Cir. 2006), Cook argues that he has a protected liberty interest under the Due Process Clause to the United States Constitution[8] in maintaining a parental relationship with his daughter and to freely make personal choices affecting matters of family life. Cook contends that his parental rights and right to maintain a parental relationship with his daughter were interfered with by Superintendent's use of prison policy to deny the transfer of funds. Cook also appears to argue that the prison policy at issue does not require a family member, who is also an inmate, to obtain approval to receive funds. Cook further maintains that Superintendent did not have a legitimate reason for denying the money transfer to Landers.

We first observe that the DOC policy at issue, DC-ADM 803 §1.A.5, which governs the transfer of money to or from inmates, provides, in relevant part, as follows:

> An inmate may not . . . *transfer or receive* through any means whatsoever, negotiable instruments, money, or items of monetary value to or from any other inmate, former inmate, parolee, probationer, co-defendant, the individual family members of any of the preceding individuals . . . without the prior written approval of the Facility Manager/designee. . . .

---

[8] The Due Process Clause to the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

14

DC-ADM 803 §1.A.5 (emphasis added).[9]  This policy clearly requires *both* the inmate transferring money and the inmate receiving money to obtain prior written approval from the Facility Manager and does not provide an exception where the inmates are family members.  Accordingly, the policy relied on by Superintendent for withholding the transfer unambiguously applies to Cook.

We next turn to whether Cook raised a valid claim based on a fundamental right to maintain a parental relationship with his daughter.[10]  In *Quilloin*, in the context of determining the constitutionality of an adoption statute, the United States Supreme Court recognized that "the relationship between parent and child is constitutionally protected" and that it is cardinal "that the custody, care and nurture of the child reside in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."  434 U.S. at 255 (citing *Prince v. Massachusetts*, 321 U.S. 158, 165-66 (1944)).  The Court also held that freedom of personal choice in matters relating to family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.  *Quilloin*, 434 U.S. at 255.

---

[9] DC-ADM 803 §1.A.5 is available on DOC's website at: https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/803%20Inmate%20Mail%20and%20Incoming%20Publications.pdf (last visited February 3, 2020).

[10] To the extent that the Complaint raised other constitutional claims or state common law claims, which is somewhat unclear from the face of the Complaint, Cook has failed to argue in his brief that any such claims are valid.  It is well-established that "[a]rguments that are not developed by providing case law or record evidence are deemed to be waived and we are precluded from addressing such issues." *School District of Philadelphia v. Jones*, 139 A.3d 358, 365 (Pa. Cmwlth. 2016).  "We decline to become substitute counsel for appellant, and as such, we will deem an issue abandoned where it has not [been] properly developed in appellant's brief." *Aveline v. Pennsylvania Board of Probation and Parole*, 729 A.2d 1254, 1256 n.5 (Pa. Cmwlth. 1999) (internal quotation marks omitted).  Here, Cook fails to argue in his brief that the trial court erred in granting summary judgment on his other claims; accordingly, we are constrained to conclude that he has waived such claims on appeal.

15

Similarly, in *Santosky*, which examined the constitutionality of a statute involving the termination of parental rights, the United States Supreme Court held that natural parents have a fundamental liberty interest in the "care, custody, and management" of their children and that a natural parent's "desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." 455 U.S. at 753, 758-59 (internal quotation marks omitted); *see also Lassiter v. Department of Social Services of Durham County, North Carolina*, 452 U.S. 18, 27 (1981) (observing that "a parent's desire for and right to the companionship, care, custody and management of his or her children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection" (internal quotation marks omitted)); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (noting that the Court had frequently emphasized the importance of the family and that the "rights to conceive and to raise one's children have been deemed essential").

Cook also relies on *Harris*, a Seventh Circuit Case which examined the constitutionality of a prison policy that prohibited inmates convicted of child molestation from visiting their minor children while in prison. 175 F. App'x at 747. There, the court noted that "[p]arents have a liberty interest, protected by the Constitution, in having a reasonable opportunity to develop close relations with their children." *Id.*

While these cases discussed the constitutional right to the companionship, care, and management of one's children, all of these cases involved a parent's rights vis-à-vis *minor* children. The Supreme Court does not appear to have ever addressed whether parents enjoy such rights with respect to emancipated, *adult* children. A majority of the circuit courts that have addressed this question have concluded that parents do not enjoy constitutional protections regarding adult children. In *McCurdy v. Dodd*, 352 F.3d 820 (3d Cir. 2003), a case involving a 42 U.S.C. §1983 claim brought

16

by a parent on behalf of an adult child killed by the Philadelphia Police Department, the Third Circuit held that "the fundamental guarantees of the Due Process Clause do not extend to a parent's interest in the *companionship of his independent adult children.*" *Id.* at 830 (emphasis added). The court also indicated that a 42 U.S.C. §1983 claim based on the parent-child relationship is not cognizable unless the official state action is *directed* at the parent-child relationship. *Id.* at 830; *see also Russ v. Watts*, 414 F.3d 783, 790-91 (7th Cir. 2005) (holding that there was no recognized constitutional right to recover for the loss of companionship of an adult child when that relationship was terminated as an *incidental* result of state action). Likewise, in *Robertson v. Hecksel*, 420 F.3d 1254 (11th Cir. 2005), the Eleventh Circuit held that a parent does not have a constitutional interest in the companionship of an adult child. *Id.* at 1260-62; *see also Butera v. District of Columbia*, 235 F.3d 637, 655-56 (D.C. Cir. 2001) (concluding that when children grow up, their dependence on their parents for guidance, socialization, and support gradually diminishes and, thus, "a parent does not have a constitutionally protected interest in the companionship of a child who is past minority and independent").[11]

As pertains to this matter, in the context of constitutional claims brought by inmates, it is well-established that "[p]rison inmates do not enjoy the same level of constitutional protections afforded to non-incarcerated citizens." *Bronson v. Central Office Review Committee*, 721 A.2d 357, 359 (Pa. 1998); *O'Toole v. Pennsylvania Department of Corrections*, 196 A.3d 260, 265 (Pa. Cmwlth. 2018). This is because "incarceration brings about the necessary withdrawal or limitation of many privileges

---

[11] *Cf. Chambers ex rel. Chambers v. School District of Philadelphia Board of Education*, 587 F.3d 176, 191 (3d Cir. 2009) (recognizing an exception for adult children who are completely dependent on their parents in nearly every aspect of daily life, such as an adult child who functions on the level of a young child); *but see Moreland v. Las Vegas Metropolitan Police Department*, 159 F.3d 365, 371 (9th Cir. 1998) (holding that a mother had standing to bring Fourteenth Amendment claim based on the deprivation of her liberty interest arising from the fatal shooting of her adult son).

17

and rights, a retraction justified by the considerations underlying our penal system." *Bronson*, 721 A.2d at 359; *O'Toole*, 196 A.3d at 266. In assessing inmate constitutional challenges, we employ a two-step approach that first asks whether the challenged policy infringes upon any of the inmate's constitutional rights. *Bussinger v. Department of Corrections*, 29 A.3d 79, 83 (Pa. Cmwlth. 2011); *Brown v. PA Department of Corrections*, 932 A.2d 316, 318 (Pa. Cmwlth. 2007). If we answer that question in the affirmative, we next "determine whether the policy is nonetheless reasonable, *i.e.*, whether it is reasonably related to legitimate penological interests." *Bussinger*, 29 A.3d at 83 (internal quotation marks omitted). The second step analyzes a number of factors including, *inter alia*, whether there is a valid and rational connection between the prison regulation and the legitimate governmental interest asserted to justify it. *Id.* at 83-84. In making this determination, "courts give substantial deference to the professional judgment of prison administrators." *Id.* at 84.

Here, the challenged policy does not infringe upon any constitutional right raised by Cook. While the United States Supreme Court has recognized a constitutional right to the care, companionship, management, and custody of children, this has only ever been applied by the Court in the context of parents' relationships with their *minor* children. *See Santosky*, 455 U.S. at 753; *Quilloin*, 434 U.S. at 255. The Third Circuit and most other circuit courts that have addressed whether parents have a constitutional right in the companionship of their *adult* children have concluded that such a right does not exist. *See Robertson*, 420 F.3d at 1261; *McCurdy*, 352 F.3d at 830; *Butera*, 235 F.3d at 656. Cook has neither alleged that his daughter is a minor or is completely dependent on him for all aspects of daily life; accordingly, he has failed to demonstrate that DOC's policy requiring inmates to gain approval before receiving funds from other inmates infringes upon a constitutional right. Moreover, given that prison inmates do not enjoy the same level of constitutional protections as non-incarcerated individuals, *see O'Toole*, 196 A.3d at 265, even assuming *arguendo* that Cook had demonstrated a

18

constitutional right to financially support his adult child, we are unable to conclude that a DOC policy requiring inmates to obtain approval prior to transferring or receiving funds, which incidentally affects the transfer of funds between inmates who happen to be in a parent/child relationship, implicates any such constitutional right.[12]

Finally, to the extent that Cook argues that Superintendent lacked a valid reason for not approving Landers' receipt of Cook's $300.00 check, the Superintendent's decision is unreviewable. In *Bronson*, our Supreme Court determined that "internal prison operations are more properly left to the legislative and executive branches, and that prison officials must be allowed to exercise their judgment in the execution of policies necessary to preserve order and maintain security free from judicial interference." 721 A.2d at 358; *see also Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 460-61 (1989) (concluding that the conditions of confinement to which a prisoner is subjected is within the sentence imposed on him and if "not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight"). Thus, where a constitutional right is not otherwise implicated, this court lacks jurisdiction to

---

[12] Likewise, even if we concluded that the DOC policy at issue infringed upon a constitutional right, we would conclude that it was reasonably related to legitimate penological interests. Superintendent contends that DOC has a legitimate interest in the way in which inmates use funds because, through forbidding unauthorized transfers between inmates, it is able to "prevent undesirable activities such as theft, gambling, strong-arming, and the selling of favors by inmates who have access to money, supplies, equipment, etc." (Superintendent's Br. at 33) (citing *Felton v. Ericksen* (W.D. Wis., No. 08-cv-227-slc, filed April 28, 2009), slip op. at 5, 2009 WL 1158685, at *2). We agree that the DC-ADM 803 requirement that inmates obtain written approval from the Facility Manager before transferring or receiving funds, is rationally related to the legitimate penological goal of preventing such undesirable activities. *See, e.g.*, *Steffey v. Orman*, 461 F.3d 1218, 1222-23 (10th Cir. 2006) (holding that prison "officials have a legitimate interest controlling both the amount and source of funds received by inmates" and that restrictions on funds received by inmates serves the legitimate penological goal of "preventing inmates from using their family members to pay off their drug, gambling or other debts to fellow inmates, or from extorting money from an inmate's family with threats of harm").

review inmate claims challenging internal prison operating procedures or proceedings. *See Shore v. Pennsylvania Department of Corrections*, 168 A.3d 374, 380-82 (Pa. Cmwlth. 2017); *Xavier v. Pennsylvania Department of Corrections* (Pa. Cmwlth., No. 331 M.D. 2016, filed February 8, 2017), slip op. at 4-5; *Weaver v. Pennsylvania Department of Corrections*, 829 A.2d 750, 751-52 (Pa. Cmwlth. 2003); *see also Orozco v. PA. Department of Corrections* (Pa. Cmwlth., No. 268 C.D. 2013, filed January 14, 2014), slip op. at 4-5 (holding that "[a] prison authority's adoption of policies and practices creates neither rights in inmates nor a constitutionally protected interest triggering the inmates' due process protection").

Here, as recognized previously, DC-ADM 803 §1.A.5 requires an inmate to obtain approval from the Facility Manager before receiving any money or negotiable instruments from another inmate. The record shows that DOC denied Landers' request to receive the $300.00 check from Cook because it determined that she already had sufficient money in her inmate account to satisfy her needs. (O.R. at Item No. 34.) Because Cook failed to demonstrate that a constitutional right was impacted and DOC has adopted an internal policy requiring DOC approval of money transfers between inmates, we are unable to review DOC's decision to deny Landers' receipt of $300.00 in accordance with its policy.

## Conclusion

Accordingly, because Cook failed to exhaust administrative remedies and failed to state a claim on which relief could be granted, the trial court did not err in granting Superintendent's motion for summary judgment.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Daryl Cook,                      :

           Appellant         :

                              :   No.  572 C.D. 2019

          v.                 :

                              :

Robert Smith               :

## *PER CURIAM*

## *ORDER*

AND NOW, this 7th day of February, 2020, the order of the Court of Common Pleas of Lycoming County, dated February 12, 2019, is hereby affirmed.